In the Matters of ABRAHAM KARP, MARK ALTER, EMANUEL A. BUSCH, PHILIP RUSGO, JOSEPH ARONSTEIN, JOSEPH A. BUTLER, JAMES J. MAYER, HENRY O. KAHAN, ROBERT J. FITZSIMMONS, SAMUEL GOLDSTEIN, WILLIAM J. MCAULIFFE, GEORGE HIRSCH, KEVIE FRANKEL, JOSEPH WEBER and ALBERT B. KURTZ, Attorneys at Law, Respondents.

First Department, March 16, 1934.

*Samuel Seabury* of counsel [*George Trosk* and *Philip W. Haberman, Jr.*, with him on the brief; *Einar Chrystie*, attorney for the Association of the Bar of the City of New York; *George R. Adams*, attorney for New York County Lawyers' Association], for the petitioners.

*Stanley C. Fowler* of counsel [*Ralph O. L. Fay* with him on the brief], for the respondent Abraham Karp.

*Robert S. Johnstone* of counsel [*Johnstone & Richter*, attorneys], for the respondent Mark Alter.

*Sidney D. Newhouse* of counsel [*Robert H. Elder*, attorney], for the respondent Emanuel A. Busch.

*John Caldwell Myers*, for the respondent Robert J. Fitzsimmons.

*Harold R. Medina* of counsel [*Eugene A. Sherpick* with him on the brief; *Hamilton & Freeman*, attorneys], for the respondent William J. McAuliffe.

*Louis Susman*, for the respondent James J. Mayer.

*Kopp, Markewich & Null*, for the respondents Philip Rusgo and Joseph Aronstein.

*Stanley C. Fowler*, for the respondent Samuel Goldstein.

*D. P. Siegel*, for the respondent Kevie Frankel.

*L. Fabricant*, for the respondent Joseph Weber.

*Joseph A. Butler*, respondent in person.

*Albert B. Kurtz*, respondent in person.

FINCH, P. J. On May 29, 1931, Hon. Samuel Seabury, the referee theretofore appointed by this court to investigate the Magistrates' Courts of the First Judicial Department, the magistrates thereof and the attorneys at law practicing in said courts,

filed an intermediate report in which was stated in substance that upon the facts adduced before him the attorneys above named have been guilty of professional misconduct in connection with their practice in the Magistrates' Courts, as therein more particularly set forth.

On June 22 and July 3, 1931, the Association of the Bar of the City of New York and the New York County Lawyers' Association jointly presented to this court separate petitions charging each of the above-named attorneys with professional misconduct substantially as set forth in the report of said referee and asking this court to take appropriate action thereon. On June 24 and July 6, 1931, separate orders were entered by this court appointing Hon. Clarence J. Shearn as referee to take proof of the charges set forth in said petitions and to report the same with his opinion thereon.

While the hearings were pending before the referee it was urged that, with the exception of the Kurtz case, the proceedings be consolidated and that the evidence taken may be used for or against any of the respondents.

On December 15, 1931, Hon. Clarence J. Shearn filed his report as referee herein, in which he recommended that the respondent William J. McAuliffe be disbarred, the respondent Mark Alter censured, and that the proceedings against the remaining respondents be dismissed.

In April, 1932, pursuant to an order of this court, made upon the application of the respondent McAuliffe, the referee took additional evidence in that case and on September 1, 1932, filed a supplemental report affirming his original findings and recommendation.

The respondent Henry O. Kahan has died since the filing of the report of the referee.

The undertaking by Hon. Clarence J. Shearn of this unpleasant, difficult and laborious task does much credit to his community and professional sense of duty. The hearings were conducted with great patience and painstaking care, the testimony covering more than 3,800 pages. The report of the learned referee presents outstanding evidence of his careful consideration.

Upon this motion the petitioners state that they do not question the conclusion in any case where they think it may be said the evidence leaves room for a difference of opinion. In consequence, petitioners do not oppose the confirmation of the report in so far as it recommends the dismissal of the petitions against Philip Rusgo, Joseph Aronstein, Joseph A. Butler, James J. Mayer, Robert J. Fitzsimmons, Samuel Goldstein, Joseph Weber, Kevie Frankel and Albert B. Kurtz. This also clears the name of Henry O. Kahan.

The petitioners further state, however, that they believe the evidence is clear and convincing that the respondents Abraham Karp, Emanuel A. Busch, George Hirsch and Mark Alter have been guilty of serious professional misconduct and that as to these respondents the report of the learned referee should not be confirmed.

As to the respondent George Hirsch, the question has become academic for the reason that since the filing of the referee's report said respondent has pleaded guilty to a charge of grand larceny in the Court of General Sessions, New York county, and his name has been stricken from the roll of attorneys. (See 238 App. Div. 570.)

In reference to the respondent William J. McAuliffe, the referee finds that certain of the charges are sustained by the evidence and recommends his disbarment, and as to this the petitioners ask confirmation.

We, therefore, proceed to take up the charges against Karp, Busch, Alter and McAuliffe.

The basis of the charge against the respondent Karp was the payment of money in specific cases to one John C. Weston (who, between 1921 and 1929, acted as assistant district attorney in that part of the Magistrates' Court generally known as the Women's Court) pursuant to a corrupt bargain whereby Weston refrained from presenting a case in the best interests of the People when the respondent represented the defendant and, following the trial, would receive from the respondent sums of money, generally twenty-five dollars, for each defendant acquitted. In addition to the charge of bribery in specific cases, it is charged generally that the respondent made a practice of giving money to Weston as above. Additional charges of misconduct, not relating to the bribery charge involving Weston, are made against respondent Karp, but in view of the finding herein with reference to such respondent it is unnecessary to consider them.

In order not to lengthen this opinion unduly, suffice it to say that the referee concluded that the charges against this respondent should be dismissed because the testimony of Weston has not been convincingly corroborated so as to pin the source of the moneys on the respondents. It appears from the report of the referee that he was convinced that Weston was in possession of a corruption fund produced from bribes from persons interested in the outcome of cases in the Women's Court; that Weston was guilty of corrupt conduct while acting as a public prosecutor in that court and that he did not press the cases and remained passive while police officers swore the cases out of court, and that Weston aided the respondent in securing acquittals. In his report the referee says: " The

material point in these cases is the identification of these respondents as to the source of the corruption fund that was found in Weston's numerous bank accounts." That Weston received the money, amounting to some $10,000, and that it arose from corrupt conduct while acting as a public prosecutor in that court, cannot be gainsaid. Such bribery of Weston was the basis of the charge against all the respondents, except the respondent Weber. The latter was not charged with a corrupt bargain but that in one specific instance he paid Weston the sum of twenty-five dollars following a dismissal.

The cases of Karp and Busch differ markedly from the cases of the other respondents. Under this charge the distinction between the cases of Karp and Busch and that of the other respondents is that, as to the latter, the records disclose occasional instances where the facts justified suspicion of corruption. In his report the referee states: " It suffices to state here that, except in the cases of the respondents Karp and Busch, the records disclose only occasional instances * * * where it may be fairly inferred that Weston's conduct of the trial was corrupt. * * * But in cases of the respondents Karp and Busch a somewhat different situation is presented. Here, particularly in the case of the respondent Karp, the instances of Weston's lax conduct of trials are numerous. * * * In an occasional case it may be readily inferred that Weston was paid by the police or bondsmen or by the defendants or others, as has been stated. But where, as in the case of respondent Karp, co-operation with the defense is inferable in several cases, the defendants all being different and the officers frequently being different, but the attorney being the same, one is led to infer that the management of the scheme lay in the hands of the attorney. The subtle ways in which Weston could lend successful cooperation in bringing about the breakdown of prosecutions would be best known, if not exclusively known, to a lawyer specializing in this practice, as did the respondents Karp and Busch. * * * Of a group of the respondent Busch's cases, several not only involve co-operation by Weston but also tampering with the police."

As to the respondent Karp, the evidence clearly establishes, and the referee has found, that in case after case in which this respondent represented the defendants Weston was bribed and " threw " the case. In seventy-five to ninety cases Weston has sworn that the bribe came from respondent, and many of the records corroborate perfectly Weston's testimony that the bribe came from respondent. Weston testified to the time, the place and the circumstance of the bribery by respondent. The idea that the bribe might have come from a defendant without the medium of her own attorney, not only does not have the ring of probability but in

addition, as already noted, bribery was present in the numerous cases where the defendants were all different but the attorney was the same, namely, respondent. In one of the Del Borno cases, in which this respondent appeared for the defendant, according to the finding of the referee, the record " reeks with suspicion." Mrs. Del Borno also testified that this respondent took money from her for the express purpose of committing bribery with it. In the Norman-Richardson case the referee has found that Weston's conduct was " precisely the kind that respondent would reward." Neither Karp nor the respondent Busch kept books from which either the receipt or the disposition of moneys received in the course of practice or their professional activities could be disclosed, and respondent Karp gave false testimony with respect to his bank accounts. In reference to the respondent Busch, Weston testified that he received at least one hundred payments from this respondent and gave the details as to the payments, naming the place and the dates. The cases are numerous in which this respondent appeared where the evidence shows that the case was " thrown " by Weston. In two instances this respondent also represented Mrs. Del Borno, and she testified she paid him money upon his express request, that he wanted it for bribery. If this testimony is true, respondent so used it, or he obtained this money upon false representations.

We are of the opinion that in the cases of respondents Karp and Busch this record warrants the conclusion that the respondents were the bribers. While it is true that Weston is a confessed bribe taker, yet as against a conjecture that some person or persons other than the respondents did the bribing, of which there is no evidence in the record, there is the positive testimony of Weston that these respondents were the bribers. The quære naturally suggests itself why Weston, who was friendly with these respondents, should falsely accuse them of being the bribers. If the bribes were paid by other persons, why should Weston seek to save them and throw the blame on members of his own profession, with whom he maintained friendly relations for years, and did not appear unfriendly at the time of giving testimony herein? By testifying to the bribing, Weston gained nothing for himself. Why should he have concocted and sworn to a plot against his friends when he could have testified that the money came from policemen, bondsmen and others to him unknown and unidentified? In the latter case Weston would have avoided all danger to himself and could have ended the matter with resignation and disbarment. It would appear, as already noted, that the referee believed that Weston had been bribed at least by some of the respondents, but felt that Weston was corroborated insufficiently by the records of the cases to warrant a finding adverse

to any particular respondent. The characterization of these payments, whether as bribes or gratuities, is of small moment as long as there were payments of moneys following the dismissal of the cases. The referee in his report has pointed this out clearly, namely, " that the crux of the offense, as claimed to be finally developed by the evidence, is the payment by the respondents of sums of money to the public prosecutor after the dismissal of cases, for regardless of whether any bargain was proved, or whether Weston affirmatively aided in procuring the dismissal of cases, such conduct would clearly demonstrate the unfitness of the respondents to continue as members of the bar." Where the instances of such payment are occasional, which is true in the cases of all respondents except Karp and Busch, then the evidence may be insufficient to warrant a finding adverse to any particular respondent, but where as in the case of respondents Karp and Busch co-operation with the defense is inferable in many cases and the defendants in such cases are all different and in such cases the police officers are frequently different but in all cases the attorney is the same, the inference, as already noted, then becomes very strong that the management of the scheme lay in the hands of the attorney. Especially is this true where, in addition to the above, we have the corruption admitted and the positive testimony of Weston against these respondents of the precise payments of money in from seventy-five to ninety cases as against respondent Karp and approximately one hundred cases in the case of respondent Busch. Nowhere in this record has there been a denial of the existence of the heart-rending and shameful conditions prevailing in the Women's Court. Is it not unreasonable to suppose that these respondents, to whom the trial of vice cases was no novelty, could have escaped the all-prevailing influence of these disgraceful conditions? Respondent Karp did seventy to seventy-five per cent of his criminal practice in this court and had approximately 200 of these cases a year — respondent Busch, 250. Indeed the referee himself says of the respondents Karp and Busch: " The fact that points most strongly to these respondents as the guilty ones is that the nature of the corruption was such that the respondents would hardly fail to be cognizant of it." The corrupt and farcical performances established by the records of the trials in evidence in this case could not possibly have been indulged in without the guilty knowledge and active co-operation of the attorneys for the defendants. The common sense view of the situation must be taken. It is unreasonable to conclude that Weston's dereliction of duty could be found only in those cases where there is proof that he received his customary twenty-five dollars. All knew, including Weston, the attorneys and the police, that Weston's part

in the bargain was to stand by and permit the conspiracy to defeat justice to be carried out. And if he took no steps to block the execution of that conspiracy, Weston would receive a series of intermittent payments, no one very large in itself but altogether affording him an income far in excess of his salary as a process server attached to the office of the district attorney. In the case of respondent Karp, further corroboration, as already noted, is found in the testimony of Mrs. Del Borno, one of the defendants for whom Karp appeared as attorney in defense of three separate charges of vagrancy, that she gave money to Karp to be used in bribing the police officers who made the arrest not to testify to facts sufficient to sustain a conviction. The substance of the testimony of Mrs. Del Borno is that each time she submitted to an exorbitant fee fixed by the attorney to include a sum to be used for bribery, she was acquitted. Each time she refused to include such sum specified for the purpose of bribery, she was convicted. Her testimony as to the payments is corroborated by records of withdrawals from her bank. The testimony of Weston and the other witnesses called by the petitioners has been corroborated by documentary proof and by the records of the trial of the cases wherein respondents are alleged to have paid Weston money or obtained money from their clients by stating that such money was to be used to bribe persons connected with the prosecution thereof. In the cases of Karp and Busch, where the multiplicity of instances removes the danger of error and where at the same time the credibility of the respondents is seriously impaired, the cumulative effect of the records of trials which smell of corruption, coupled with Weston's confessions, leads to the conclusion that as to the respondents Karp and Busch the burden of proof has been amply sustained.

The respondents Karp and Busch should be disbarred.

Taking up the case of the respondent Alter, it has already been noted, as found by the referee, that this respondent fell within the class of occasional instances where it might be fairly inferred that Weston's conduct of the trial was corrupt, but where we give the benefit of the doubt to the respondent as the source of the bribe. As to the finding on this charge, we concur with the referee.

The learned referee has further found, however, that the respondent Alter was guilty of professional misconduct in demanding of one Nina Artska an additional fee of $100 after the respondent had agreed to defend her upon a charge of vagrancy for the sum of $250, which amount she paid him. The demand for $100 additional was made half an hour before the case was reached on the calendar. The defendant was unable to make this payment at that time, and the respondent told her she had to promise to bring

it in a few days. This promise was given, because the defendant believed she was in the power of the respondent. After the trial the defendant paid the respondent fifty dollars additional and received a receipt in full, although later she was besought to make additional payments and did make one or two small payments of five dollars each. We concur in the finding of the referee that this respondent in demanding this additional fee under the aforesaid circumstances was unconscionable, as well as unethical, and merits the censure of this court.

The respondent William J. McAuliffe, in addition to the charge of bribing Weston, which charge because of the occasional instance we find not to be sustained, was charged also with having agreed with one Lillian Greiner, whom the respondent represented as attorney in a prosecution in the Women's Court on a charge of vagrancy, that if she would give him $200 the respondent would pay same to the arresting officer for the purpose of inducing him to absent himself from court on the day of the trial, to the end that the case might be dismissed by the magistrate. It is also charged that pursuant to such agreement the defendant paid the respondent $200 on November 20, 1928, and the respondent either entered into and carried out such corrupt bargain with the arresting officer or was guilty of obtaining money from his client under false pretenses. The learned referee reports that there was no evidence that the respondent had anything to do with the absence of the arresting officer, who was in another court at the time of the Greiner dismissal. The referee does find, however, that the respondent was guilty of obtaining money from his client by false pretenses. Concededly, the respondent received from his client Mrs. Greiner a payment of $200 in addition to a previous payment of $100. The respondent claimed that $300 was agreed upon as his fee for defending Mrs. Greiner, the latter stating, however, she could only afford to pay $100 at that time and would pay the balance later. The fact that Mrs. Greiner then had over $2,500 on deposit in her account, of which her bank book was deposited with the witness Arlotta as security for bail furnished by the latter, tends to discredit said claim. Arlotta, a bondsman, had his office in that of the respondent across the way from Jefferson Market Court. The corroborative testimony of Arlotta given upon a reopening of the case at the request of the respondent, does not ring true. On the other hand, the testimony of Mrs. Greiner, that the respondent had requested an additional $200 for paying the arresting officer to keep away from the trial, is corroborated not only by that of her son, but also by the testimony of the disinterested witness Hommel, to the extent that he testified that the fee agreed upon for

defending the case was $100. The evidence shows that the respondent McAuliffe obtained the sum of $200 from his client Lillian Greiner by means of false representations or for the purpose of bribery. In addition, his testimony with reference to the amount of the fee agreed upon was perjurious. The finding of the referee that respondent McAuliffe should be disbarred should be confirmed.

O'MALLEY, J., dissents as to the respondents Karp and Busch.

O'MALLEY, J. (dissenting). I prefer to accept, rather than reject, the conclusions of the able, experienced and conscientious referee who has come to our aid in these important and troublesome proceedings. As a former member of this court he participated in numerous similar proceedings. He heard and saw the witnesses and the respondents, and breathed the atmosphere of the hearings. We should hesitate in such circumstances to substitute our judgment for his, and I, therefore, vote to confirm his report in all respects.

GLENNON, J. (Prevailing opinion in McAuliffe proceeding.) The respondent William J. McAuliffe was one of the fourteen lawyers against whom charges were preferred, based upon the statements of one John C. Weston.

It is unnecessary to comment upon Judge Shearn's report, except in so far as it refers to Mr. McAuliffe, since we concur in the opinion of the presiding justice in so far as the other respondents are concerned.

We have examined with great care the testimony taken before the learned referee, his report and the briefs which were presented upon the argument.

Three separate charges were preferred against McAuliffe. The referee has recommended that the first two should be dismissed. The evidence indicates quite clearly that, as to these, the findings of the referee should be approved.

The third charge was made by one Lillian Greiner, who was arrested on November 15, 1928, for a violation of clause (a) of subdivision 4 of section 887 of the Code of Criminal Procedure. The charge grew out of certain testimony which Mrs. Greiner gave in the investigation into the practices of the Magistrates' Courts about a year and a half after her case was disposed of in the Women's Court. She asserted that on the night of her arrest the respondent agreed to represent her for the sum of $100. Subsequent thereto she claims that the respondent told her that if she gave him an additional sum of $200 to be divided among the arresting officers, the case would be dismissed. It was the contention of the petitioners that the respondent either entered into and carried out the corrupt bargain with the arresting officers or was guilty of obtaining money from his

client under false pretenses. Respondent, in answer, absolutely denied the charge. He claimed that on the night of the arrest, his client, the prisoner, agreed to pay him the sum of $300 for representing her, $100 thereof was to be paid the following morning and $200 on the day the case was reached for trial.

The referee has reported that there is no evidence that the respondent had anything to do with the absence of the arresting officer, who was in fact in another court at the time the defendant was discharged. However, the referee has reported that the respondent obtained money from his client under false pretenses. That conclusion was based upon the assumption that Mrs. Greiner's version of the facts was correct.

Perhaps a brief review of the testimony will be helpful for the purpose of indicating our reasons for believing that her testimony is incredible and that the proceedings should be dismissed. In referring to the type of witness Mrs. Greiner was, the referee has stated: " She appeared to be a voluble, very excitable woman, prone to suspicion and was ready in drawing conclusions upon slight and inadequate basis of fact."

It appears that she maintained a beauty parlor in her home at No. 568 West One Hundred and Seventieth street, where she treated men as well as women. She had a private telephone and advertised her business in a picture publication called the *Graphic*. She was fifty years of age and had been married to one Greiner for a great many years. She sued him for a divorce. Before the case was reached for trial, her husband died, and she remarried in the month following his death. She refused to disclose her correct name, even to the referee. She said: " It's nobody's business. My name at that time was Mrs. Greiner, my maiden name was Caroline Dierks." She refused also to give her home address. The reason assigned was " Because they poisoned me once, somebody put poison in my coffee, and I was sick; I don't want anybody to know where I am." She related that " She was passing through a change of life;" " That she was nervous and had to take pills every day for a period of about two years." With all her ailments, in referring apparently to the man who disrobed in her apartment at the time of her arrest, she said: " If I met him to-day I would beat him up on the street. I don't need my son to protect me, I can beat up that man, put him in front of me on the street now and I show you."

In order not to unduly prolong this opinion, we next turn to her testimony given in support of the charge. She asserted that the basic conversation took place as she and her son Herbert were leaving the court after the adjournment on the day she was arraigned

for pleading. According to her at that time, respondent said: " 'Mrs. Greiner, I want to see you.' And I said, ' Yes, sir,' and we walked over to him. He said, ' you give me $200.' I said, ' Yes, what for?' Then he said, ' Nobody does know about it. You know you had three arresting officers in your place.' * * * He said, ' I have to take the $200 and divide it between the detectives,' that is what he said, and then I said, ' Well, I wouldn't give you $200. I have to speak to my son.' My son was standing away a little. I said, ' Herbie, what do you think of it, he wants $200 more.' He said, ' Mom, that is a shame, you certainly work hard for the money, but before you give to the doctor, and you are nervous, you had better give him the $200.' And he walked over to him to Mr. McAuliffe and talked it over and he repeated the same things to my son, that he has to divide the money between the detectives to keep him away and my record will be clean and there will never be anything on the papers. I said to my son, ' Well, Herbie, money isn't everything, I would not want my name and your name stained for anything in the world.' That is what I answered to my son. Q. Did you agree to pay? A. $200 more, yes, I did agree."

On cross-examination of this witness we find the following testimony: " Q. And did he say anything to scare you? A. No, that man never scared me. He never said anything out of the way to me. He was always a gentleman. Q. He always told the truth so far as you know. A. He always told the truth. Q. And you are perfectly satisfied with his services? A. Yes. Q. And he said ' You pay me $200 more if you are perfectly satisfied?' A. That is what he said, yes, sir. Q. So that the payment of the $200 depended upon you entirely? A. Yes, sure; I did not have to give it to him; I was not forced to give it to him. * * * Q. And if you said that you were not satisfied, or if you did not want to pay the money, you did not have to? A. No, I did not have to. Q. That was the understanding? A. That is right; and if I do not pay I think nothing would have happened here. Q. Whether the case was dismissed or whether you were found guilty? A. If I were found guilty I would never have to pay the $200. Q. Then naturally you would not be satisfied? A. No, sir. Q. But if the case went to trial and you were acquitted and you were perfectly satisfied, then you would pay him the $200? A. Certainly; and he kept his word too."

The only witness who corroborated Mrs. Greiner in any detail at all was her son Herbert. While the referee comments on the fact that this witness was out of the room at the time his mother gave her testimony, still in considering the weight to be given to his

evidence, we must take into consideration the relationship of the parties, together with the opportunity they might have had to go over the testimony which both were about to give in order to make it harmonize. This thought is borne out by an answer of the son wherein he said, " Well, we would naturally talk about the case. No use of me saying no, because you naturally would speak about the case, but we did not go over it exactly."

Suffice it to say that the record indicates that this witness was no less voluble than his mother and probably no more worthy of belief.

The testimony of Siegfried Hommel, who was present on the night Mrs. Greiner was released on bail, was of little or no help in sustaining the charge which the respondent had to meet. While he said he heard the sum of $100 mentioned, when he was asked on cross-examination if he could repeat in substance the portion of the conversation between Mrs. Greiner and the respondent, wherein the arrangement for the fee was made, he said that he could not.

Reference has been made to the fact that Mrs. Greiner had instituted a suit for divorce against her husband. She was represented in that case by Abraham Goldberg, a member of the bar. He was called as a witness by the respondent. While Mrs. Greiner told Mr. Goldberg " every detail of the case," even to the extent that she found her customer absolutely nude in her apartment and even though he was present at the request of Mrs. Greiner at the time his client was discharged in the Magistrates' Court, still neither she nor her sons ever told him in words or substance that she had paid the respondent $200 for the purpose of paying it over to the police officers.

It is unnecessary to detail at length the testimony offered by respondent. He was born and brought up in the neighborhood where his office at No. 103 West Tenth street was located. He was thirty-three years of age. He was admitted to the bar in 1924, after graduating from New York University Law School, where his course was interrupted by his service as a lieutenant in the army during the war. In 1925 he was elected a member of the board of aldermen of the city of New York.

The testimonials as to his character from outstanding citizens indicated that he always enjoyed an excellent reputation for honesty, decency and integrity. The referee has stated: " This evidence of good character is respondent's strongest aid." In a proceeding such as this, where a question of credibility is involved, good character evidence may be controlling.

As we read the record, we reached the conclusion that the respondent was a truthful witness. Comment is made upon the fact that he frequently used the words " belief " and " best recollection."

in answering several of the questions which were propounded to him. Frequently, an honest witness, who is not of the " voluble type," has occasion to use expressions such as those mentioned. For instance, when asked if the list of cases which was prepared by the official stenographer of the court was correct, his answer was, " Yes, I believe so." A less truthful witness might readily have answered in the affirmative without using the qualifying clause, " I believe so." Another point must not be overlooked in judging the veracity of this witness. There was a lapse of about two years and six months between the date he was retained and the time he was called as a witness.

McAuliffe denied unequivocally that he ever made any arrangement whereby he was to divide the sum of $200 among the arresting officers. In substance, he said that, on the night of the arrest, he was attending a meeting in the American Legion rooms which were located over his office in No. 103 West Tenth street. He was called out of the meeting by John Arlotta, a licensed bondsman, who had his office in the same building. He then met Mrs. Greiner and had a talk with her pertaining to the case, and an arrangement was then made for him to appear as her attorney and the fee was fixed at the sum of $300. It was agreed that $100 was to be paid to him the following day, and the balance of $200 after the case was disposed of in the Magistrates' Court. While he was put through a rigid cross-examination as to the nature of his business, there was nothing developed in his testimony which would lead one to believe that a man of his excellent reputation was not telling the truth. It seems to be almost common knowledge that arrangements are frequently made between attorney and client, whereby a certain amount of money is given as a retainer and the balance is paid on the day the case is reached for trial or at some later date.

Comment was made in his report by the learned referee upon the failure of the respondent to produce Mr. Arlotta at the hearings. It was stated, " That Arlotta had gone south." Any doubt that respondent told the truth in that regard was removed by the uncontradicted testimony of this witness. After the report was filed, an application was made to reopen the hearing for the purpose of taking the testimony of Arlotta. The application was granted and the result was that Mr. Arlotta was called. It appeared that he actually had gone south and was out of New York for a period of nearly a year. During that time he was engaged in a partnership with a man named Boswell, in the carnival business. He corroborated the version of facts as to the arrangements made between respondent and his client sufficiently, at least, to cause one to doubt wherein the truth really lay.

We do not agree with the conclusion reached by the presiding justice that the testimony given by this particular witness does not ring true. There is nothing in the record to indicate that this witness deliberately committed perjury. The only motive he could have had for false swearing was the fact that he was acquainted with the respondent.

Realizing, as we do, the grave consequences to an attorney as a result of disbarment, coupled with the fact that the testimony against him is of an unreliable character, and that the respondent William J. McAuliffe prior to the institution of these charges had an unblemished reputation, we have reached the conclusion that this proceeding, in so far as it affects him, should be dismissed.

MARTIN and TOWNLEY, JJ., concur.

FINCH, P. J., and O'MALLEY, J., dissent as to the respondent McAuliffe and vote for disbarment.

As to respondents Rusgo, Aronstein, Butler, Mayer, Fitzsimmons, Goldstein, McAuliffe, Frankel, Weber and Kurtz, proceedings dismissed; respondents Karp and Busch disbarred; respondent Alter censured.