(No. 6180.   January 2, 1935.)

In re OTTO D. BURNS.

[40 Pac. (2d) 105.]

Ben F. Tweedy and P. E. Stookey, for Petitioner.

Paul W. Hyatt and Abe Goff, Prosecuting Committee.

GIVENS, J.—A petition was filed with the State Bar Commission seeking the disbarment of Otto D. Burns on three counts: One of which, the "Scott matter," will not be considered because the commission found no impropriety therein; the other two involve the following situations:

Burns had been employed by one Wolff to secure a settlement for a claim for damages for alleged malpractice against a Dr. Carssow, concededly on an initial agreement for a fee of ten per cent. After lengthy negotiations a settlement

was finally secured, whereupon Burns retained $1,000 in cash more than the ten per cent, on his contention that additional work had been done justiying the increased fee.

Wolff contended that there was no agreement for such additional payments and demanded the $1,000.

In the "Klans matter," the charge was based upon Burns' contention that he owned one-half of a note, which had been given him by Klans for collection, contrary to Klans' testimony and view of the matter, and Burns' failure to account or turn over to Klans $40, which the debtor Madden testifies he had paid Burns, though Burns denied he had received the $40.

Disbarment was sought on both counts under subd. 5 of sec. 3–301, I. C. A.:

"An attorney and counselor may be removed, suspended, or reprimanded by the Supreme Court and by the district court for either of the following causes arising after his admission to practice: . . . .

"Failure for ten days after written demand, and payment or tender of the fees and expenses due him from his client to pay over or deliver any money or other property belonging to his client which he shall receive in his office of attorney or counselor in the course of collection or settlement of any claim or demand."

The commission found that Burns had no right to retain and should have repaid the $1,000, and should have accounted for the $40, and paid at least one-half thereof; and ordered his suspension for three months.

The record was filed herein July 18, 1934, Burns petitioned for review July 23, 1934, and will herein be referred to as the petitioner. He raises two points of procedure: First, that the committee on discipline, after demurrers had been interposed to the original charges for disbarment, and set for hearing, was discharged, and the commission thereafter took charge of the proceedings and made findings and recommendations.

Rule No. 41 of the rules governing conduct of attorneys and discipline, adopted by the board and approved by this court October 19, 1929, provides that the board may recall any investigation from the discipline committee at any stage of the proceedings, and no legal prejudice has been shown, or intimated as resulting from such action, nor has anything been advanced to indicate that the commission was not entirely fair and impartial in thereafter considering the matter.

Petitioner also complains because the original petition made no mention of the $40 in the "Klans matter." This subject, however, was fully covered by the testimony and the petitioner had every opportunity to, and did, present his evidence, hence there was no prejudice. (*In re Scott,* 53 Nev. 24, 292 Pac. 291, 296.)

The Prosecuting Committee on August 31, 1934, filed a petition for review asking:

" . . . . that the petition for review presented by the accused be granted and that this Court fully review the evidence and all the proceedings taken in this matter."

This petition was filed more than thirty days after the record was filed herein. It is unnecessary, however, to decide whether the Prosecuting Committee could file a petition for review, or whether it was on time, because on petitioner's review we have considered everything that the Prosecuting Committee suggested.

Petitioner contends that the court has neither jurisdiction nor right in a disbarment proceeding to determine whether the attorney owes the client any money, but that such question must be decided in a civil proceeding. While there may be found cases to the contrary, the reasoning of the authorities cited by the Supreme Court of the state of Washington, in *State v. Snook,* 78 Wash. 671, 139 Pac. 764, wherein the petitioner's contention is overruled, is persuasively controlling against petitioner's contention:

"In such a proceeding the weight of authority is to the effect that a prior civil action or criminal proceeding, look-

ing to the redressing of the injured person's wrongs, or the punishment of the attorney against whom the charges are made, is unnecessary as a condition precedent to the prosecution of disbarment proceedings against such attorney; the theory of the decisions being that disbarment proceedings are not for the purpose of redressing the wrongs of the injured person, nor for the purpose of punishing the delinquent attorney.''

This court has heretofore in effect announced this doctrine as to a criminal prosecution not being a condition precedent to disbarment. (*In re Edwards*, 45 Ida. 676, 266 Pac. 665.)

This same argument has also been advanced and overruled in a great number of cases, wherein the objection was to disbarment proceedings prior to criminal prosecution; apparently without exception where the conduct charged for disbarring an attorney falls within the sphere of his official duty, the courts have held that he may be proceeded against summarily without awaiting the result of a criminal prosecution. *Stone v. Board of Governance*, 312 Pa. 576, 168 Atl. 473, 90 A. L. R. 1109, and notes, wherein the cases supporting this rule are set out, including decisions of Florida, Idaho, Illinois, Indiana, Kansas, Montana, Nebraska, New York, Ohio, Pennsylvania, South Carolina and Tennessee, and also cases from some of these and other states to the effect that acquittal in a criminal case will not prevent disbarment for professional misconduct arising out of the same transaction. (*People ex rel. Colorado Bar Assn. v. Mead*, 39 Colo. 344, 68 Pac. 241.)

The objection to a disbarment proceeding without having one's liability for the money first determined civilly would not rest upon as favorable an argument as would the contention that one must first be found guilty in a criminal action before one may be disbarred, for the reason that in criminal cases the charge must be proved beyond a reasonable doubt, while in a civil action the cause must be proved only by a preponderance of the evidence.

As was said in *Ex parte Wall*, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. ed. 552:

"This proceeding is not for punishment but for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them."

See also: *Perry v. State*, 3 G. Greene (Iowa), 550; *Watson v. Citizens' Sav. Bank*, 5 S. C. 159; *In re Davies*, 93 Pa. 116, 39 Am. Rep. 729; *Gale's Case*, 1 Pa. Co. Ct. R. 236; *Davis v. State*, 92 Tenn. 634, 23 S. W. 59; *State v. Finley*, 30 Fla. 302, 11 So. 500; *Hyatt v. Hamilton County*, (Iowa) 90 N. W. 508; *Ex parte Tanner*, 49 Or. 31, 88 Pac. 301; *State v. Winton*, 11 Or. 456, 5 Pac. 337, 50 Am. Rep. 486; *In re Platz*, 42 Utah, 439, 132 Pac. 390; *In re Thatcher*, 190 Fed. 969; *In re Durant*, 80 Conn. 140, 67 Atl. 497, 10 Ann. Cas. 539; *In re Jones*, 70 Vt. 71, 39 Atl. 1087; *State v. McRae*, 49 Fla. 389, 38 So. 605, 6 Ann. Cas. 580; *In re Bauder*, 128 App. Div. 346, 112 N. Y. Supp. 761; *Wernimont v. State*, 101 Ark. 210, 142 S. W. 194, Ann. Cas. 1913D, 1156; *McIntosh v. State Bar of California*, 211 Cal. 261, 294 Pac. 1067; *State v. Barto*, 202 Wis. 329, 232 N. W. 553.

■■ The proceedings in the criminal action in this matter, *State v. Burns*, 53 Ida. 418, 23 Pac. (2d) 731, in no way adjudicated the substance of the controversy. The reversal in that case was solely because the criminal statute under which the prosecution was laid was void for uncertainty. Any recital of the facts and circumstances were not expressions indicating in any way the attitude of this court as to the merits of the case, aside from the question of the validity of the statute, nor are the defects in the statute there pointed out applicable as invalidating the statute herein under consideration because sec. 3–301, I. C. A., contemplates that there shall be a settlement and determination in the disbarment proceedings of whether the attorney has retained money or property belonging to the client and if so how much. Thus the criticised defects of sec. 17–1014, I. C. A., are not present in this statute, and statutes similar to this have been uniformly given sanction by other courts.

(*People v. Chamberlin*, 242 Ill. 260, 89 N. E. 994, and cases cited therein.)

There is a conflict in the evidence as to the payment of the $40 in the "Klans matter." There is no conflict, however, that the original contract of employment in the "Wolff matter" was only for ten per cent, and the most petitioner urges to justify his course of conduct in connection therewith was that he did more work than the ten per cent would pay for, and that the original contract was modified.

Petitioner further contends that as to the "Wolff matter" there was a complete accord and satisfaction as shown by the evidence hereafter detailed.

The commission found that there had been no settlement or compromise as contended for by petitioner. The evidence bearing on this matter was given by Mr. Wolff, his son Herbert Wolff, his daughter Mrs. Schultz and Mr. Wm. A. LaFollett (an attorney of Colfax, Washington, whom Mr. Wolff was apparently finally compelled to call in and assist before he could get the petitioner to do anything in connection with the action for malpractice), the petitioner himself and one of his sons, who testified in substance as follows:

Mr. Wolff: "Burns said in the office: 'I won't give you any more.' We argued there for an hour and a half or two hours, and then he said: 'I am going home.' He put down the second $500 and said: 'I am going home. You can take this or leave it.' First he gave me $2,000 in notes and $498, after talking an hour and a half he opened up and gave me $500 more. The first time he gave me $498 which I have referred to as the first $500."

Mr. Herbert Wolff: "My father, Mrs. Schultz and I protested very vigorously, and we argued about the difference in our settlement—that Mr. Burns wasn't sticking to his ten per cent agreement, and we insisted that he was entitled to only ten per cent. He admitted that there was a ten per cent agreement but he insisted that at one time we had raised our demand in this case from 6,000 to 10,000 and he thought at that time that it made more work for him and that he should have a little more. That is what he gave

as his reasons. I think Mr. LaFollett had a conversation with Mr. Burns that I didn't hear, and father protested and pleaded that he wanted the balance of his money and Mr. Burns refused it. I think shortly after Mr. LaFollett had talked to Mr. Burns, Burns did finally give Dad $500 more of the money. Burns had laid down the first $498, and as the case progressed he finally laid down another $500. Burns swore he wasn't going to give us any more but in order to keep us quiet he was giving us the $500 more. We asked for $500 more and he refused and about that time, I think shortly after, Mr. LaFollett left, I had occasion to step out of the room. Mr. Burns was there when I left and upon my return, about fifteen or twenty minutes later, Mr. Burns was not there, only my father and sister. When I returned the $498 and the second $500 were lying on the table, and we picked it up and took it to the Lewiston National Bank.''

Mrs. Schultz: ''I was there when Mr. Burns came in and my father and my brother insisted that Mr. Burns was to have his ten per cent of any amount collected. When Mr. Burns came in he laid down $2,000 in notes and said: 'Mr. Wolff, here is the notes. I have paid Mr. LaFollett $500 here is $498, I am keeping $2,000.' Father said: 'We can't accept this, you agreed to take this case for ten per cent of the amount collected.' Mr. Burns denied the existence of a ten per cent agreement. Father and Herbert insisted that he agreed to work for ten per cent. The argument continued for several hours, Mr. Burns turned over $500 more and said we could take it or leave it. Neither my father or brother accepted it. Dad said: 'Give us $500 more.' Herbert asked for another $500 also.''

Mr. Wm. A. LaFollett: ''We walked in and Mr. Burns informed them that he had paid me $500, and he gave them the notes and $498 and said: 'Now, I am keeping $2,000 for my work.' Mr. Wolff said: 'You agreed to do it for ten per cent.' Herbert said the same. Mr. Burns denied there was such an agreement. It was a warm argument and

lasted close to two hours. Mr. Burns had the $2,000 in his pocket, he took it out and showed it to them and said: 'I have got $2,000 and I am going to keep it. I have done a lot of work in this case.' He said that he had been humiliated; that he had drawn a complaint; that he had carried on numerous negotiations with the lawyers on the other side and he felt he was entitled to that much money; and they insisted at all times that it was a ten per cent agreement. The boy said: 'I ought to beat hell out of you and take the money out of your pockets'; and it waxed quite hot at times. After the argument had proceeded for a considerable time Mr. Burns and I went into the waiting room. I advised Burns to turn over the money. Later Burns laid down another $500 and said: 'I shouldn't give you this I am entitled to $2,000 but I will give you $500 more.' Mr. Wolff said: 'Give us $500—give us another $500 and you can have a $1000, and we will call it square.' Burns said: 'I won't do it. I have got $1,500 and I am going to keep it. I have done a lot of work and I am going to keep this.'

"There had not been a proposition by any of the Wolffs prior to that, that in addition to the $498 they would accept $500 and call it square. They said that if he would give them an additional $500 after he laid the $500 down, that they would give him $1,000. That is all they ever offered to settle for while I was there. They were still pleading and arguing with Mr. Burns when I took my departure."

Mr. Otto D. Burns: "I said: 'I have paid—or, Mr. La-Follett has his $500 which you folks agreed to pay; is that all right?' Herman Wolff said: 'That's too much. $300 is enough for what you have done Mr. LaFollett.' And then Herbert and Mrs. Schultz told him: 'No, Dad, that's all right. We agreed with him to have $500.' And I went further and turned over $498; laid it over on the desk, and they—I says: 'Here is $498.' I said: 'You have the notes for $2,000; you have the receipted bills for $320—160 each—,' and I said: 'I am keeping $2,000 as a reasonable

attorney's fee in this case. I have done a lot of work and I am entitled to that much under our agreement.' They objected to that. This took place in the afternoon about half past one in my office. My son was there—out in the hallway outside, and I had the—it was rather hot and I had one of the transoms open to the front window, and I had the door open between and the outer door was closed. It was the window transom looking out on the street. The old man said: 'You are trying to rob me,' or something to that effect. I told them that I had done a lot of work and that they had humiliated me; and they hadn't done what I told them, and that they had made the case harder by the way they acted, and I said: 'I'm certainly entitled to more than $2,000 but, I am taking $2,000 as a reasonable attorney's fees.' Herbert Wolff said: 'Burns you give us $500 more and we will call this a settlement.' I said: 'No, I am going to hold this $2,000.' Shortly after that Mr. LaFollett and I stepped out into the hall and I talked to him a little bit and he said that I better do that, so I came back and laid $500 more on my desk, before Mrs. Schultz and she laid her hands over it to hold it there on the desk, and then the old gentleman, after I had laid it down said: 'I won't accept that.' And Herbert looked around and I said: 'Well, aren't you going to keep your word, Herbert?' And he says: 'I want to call up Leonard before I say yes or no,' so I said: 'All right, just give me back the $500 and we will go at it the way it was before.' No, she put her hand down on this and held this money on the desk. Well, I said: 'Now, I want you folks to understand that if you are not satisfied with this settlement the way it is being made and my retaining $1,500, you just put everything here, the notes, the money and the receipted bills, and we will go to the court and see how much attorney's fees I am entitled to.' Herbert was still in the office, I think Mr. LaFollett had just left before that; after I turned over the extra $500 to them and after Herbert had demanded it he left. About the time Herbert left the office I said: 'My boy is waiting for me and he wants to get

something for the home'; 'I am going down on the street for just a few minutes and I will be right back; I will be back about the time Herbert is back, but anyway I will be back right away.' And I told them before I left the office: 'If you folks want to take the money that is there and call it a settlement, all right. If not, leave everything here, and we will settle it in the court. You can either take that money or leave it here, but if you take it it is a settlement.' And I left the office for the time being. About two or three minutes later the Wolffs came along the sidewalk past the rootbeer stand where my son and I were drinking rootbeer. After drinking our rootbeer we went back to the office right away.' "

F. E. Burns: "At the time of this settlement about 1:30, I was in the outer hall, I stayed until Dad was done, I overheard the conversation. There was considerable wrangling. I heard my Dad state that he was holding out $2,000 as attorney's fees, all of a sudden there was a great commotion and wrangling and so forth. I was there a long while, I never left the place. I was standing there by the——radiator it wasn't hot——and I heard Herbert Wolff say: 'Give us $500 more and we will call it settled.' And Dad said: 'No,' that he was going to keep the $2,000, and they wrangled about that for a long while, finally Dad and Mr. LaFollett stepped out into the outer hall where I was, and I don't know what took place between them, they talked in a low voice, and Dad went in and I heard him say: 'Here is $500 more.' And Herbert Wolff said: Well, he would have to call his brother over the 'phone and ask him whether he said yes or no. Mr. LaFollett left the building a few minutes after this offer. It seems to me that he left once and they called and got him and brought him back, but I won't swear to that. After this $500 was put on the table I heard Mr. Wolff say: 'Give me $250 more,' and also he was crying and said he was a poor man; a poor farmer, and he needed the money and not for Dad to rob him, and so forth, and bawling at the same time."

There was thus ample evidence to sustain the board's finding that there was no modification of the original contract, and that petitioner was not entitled to retain the $1,000, and that there was no legal settlement or compromise or accord and satisfaction by Wolff, but that petitioner's acts amounted to unfair compulsion on Wolff, and were entirely contrary to his duties as Wolff's attorney.

"This proceeding was subsequently commenced charging the respondent with professional misconduct in refusing to pay this money to the client. The charges were referred to the official referee, who has reported the charges proved and that the respondent was guilty of professional misconduct. The report of the official referee contains a statement of the facts. Having seen the witnesses and heard their testimony he has reported that so far as there was a dispute between the attorney and his client, the client was to be believed. It is sufficient to say that the evidence satisfies us that the official referee was right, and we approve his report." (*In re Smith,* 161 App. Div. 638, 146 N. Y. Supp. 906, 907.)

"That the client, Rich, consented to the retention of the larger sum is unquestioned, but it is clear that he did so in reliance upon respondent's advice that the fee was a reasonable one, such as reputable attorneys were in the habit of charging in like circumstances, a statement which the client accepted because of his faith in his attorney and his ignorance of business affairs.

"It was attempted on this proceeding, but not on the summary proceeding, to show that the sum retained by the respondent was less than Rich had previously agreed to pay him; that at about the time of the commencement of the proceeding to sell the real property, or shortly thereafter, Rich had agreed to pay respondent the sum of $20,000 for his services, and that respondent had actually conceded something by retaining the lesser sum. Much testimony was taken respecting the making of this prior agreement, which was denied by Rich, and it is dwelt upon by the official

referee as an important factor in the case. We consider it unimportant, so far as concerns respondent's culpability, whether this prior agreement was made or not. It is no less improper for an attorney to take advantage of his client's necessities and inexperience to induce him to make a contract in advance to pay an exorbitant fee for services than it is to take advantage of those necessities and that inexperience to exact an unreasonable fee after the services have been rendered. Nor does it lessen the impropriety of respondent's conduct that, under the spur of disciplinary proceedings, he made a settlement with his client, and paid a substantial part of the moneys which he had been adjudged to owe him. These proceedings are not designed to compel payments, but to protect and preserve the honor and integrity of the legal profession. In our opinion the charge that respondent took advantage of Rich's inexperience and deceived him as to the true value of the services rendered, thereby exacting and retaining an unreasonable sum for the services rendered is sustained." (*In re Cohen,* 169 App. Div. 544, 155 N. Y. Supp. 517, 520.)

"The respondent loses sight of the fact, however, that while attorneys at law are privileged to make contracts with their clients for remuneration for services, yet the court is vested with a supervisory control over its officers, and is authorized to investigate dealings between those officers and their clients, to see that the conduct of its officers is fair, honest, and straightforward, and that their clients are neither deceived nor defrauded in their relations with their attorneys, and, while the court does not summarily or by disciplinary proceedings investigate ordinary business contracts made by attorneys, yet when the basis of the contract is the professional relation of attorney and client its jurisdiction is plenary and ample." (*In re Levinson,* 197 App. Div. 46, 188 N. Y. Supp. 730, 732.)

"Referring to count IV, William J. Hess matter, it appears that the defendant as a broker, sold 267 shares of stock for $1,200 on June 20, 1927, to the same party who

had contracted to buy it a few months before for $2,300 and then reserved $600 for his compensation in making the sale. Not only that, he attempted to justify his conduct by alleging that he had an agreement with his client to that effect, which intensifies rather than excuses the defendant's conduct. Such an agreement would be clearly extortionate, unfair, and unreasonable, and one into which an attorney has no right to enter with his client." *Armstrong v. Morrow,* 166 Wis. 1, 163 N. W. 179, Ann. Cas. 1918E, 1156. Contracts between attorney and client are subject to the closest scrutiny. If it appears that such contracts are unfair or that the client has been overreached, the contract is set aside on principles that govern the conduct of trustees generally. The facts found by the referee disclose on the part of the defendant an utter disregard of the duties and obligations of an attorney to his client." (*State v. Barto,* 202 Wis. 329, 232 N. W. 553, 555.

"Taking up the case of respondent Alter, it has already been noted, as found by the referee, that this respondent fell within the class of occasional instances where it might be fairly inferred that Weston's conduct of the trial was corrupt, but where we give the benefit of the doubt to the respondent as the source of the bribe. As to the finding on this charge we concur with the referee.

"The learned referee has further found, however, that the respondent Alter was guilty of professional misconduct in demanding of one Nina Artska an additional fee of $100 after respondent had agreed to defend her upon a charge of vagrancy for the sum of $250, which amount she paid him. The demand for $100 additional was made half an hour before the case was reached on the calendar. The defendant was unable to make this payment at that time, and the respondent told her she had to promise to bring it in a few days. This promise was given, because the defendant believed she was in the power of respondent. After the trial the defendant paid the respondent $50 additional and received a receipt in full, although later she was besought to

make additional payments and did make one or two payments of $5 each. We concur in the finding of the referee that this respondent in demanding this additional fee under the aforesaid circumstances was unconscionable, as well as unethical, and merits the censure of this court." (*In re Karp, etc.*, 240 App. Div. 388, 270 N. Y. Supp. 113, 120, 121.)

"Many elements are to be taken into consideration, but if an attorney is not guilty of wilfully over-reaching his client or imposing on his confidence he should not be condemned. The proof to support the charge in the second count, while derogatory in character, is not sufficiently clear to justify extreme discipline." (*People v. Green*, 353 Ill. 638, 187 N. E. 811, 812.)

"There is no question in our minds, however, that his suspension was warranted under the charge that he was guilty of conduct in violation of subdivision 5 of section 287 of the Code of Civil Procedure, which conduct merits the disciplinary action of this court. The conduct of the petitioner in charging a fee so wholly disproportionate to the services performed, and particularly in a proceeding for industrial compensation in which all the legislation relative thereto emphasizes the purpose of securing justice for injured employees expeditiously and inexpensively, is conduct which cannot be reconciled with that honesty and fair dealing required of an attorney in his relations with his client.

"If the contract providing for a commission of 40 per cent. upon the amount collected as an attorney's fee was actually executed prior to the acceptance of the employment by petitioner, there can be no doubt that petitioner intended to circumvent the provisions of the Workmen's Compensation Act and to frustrate any attempt by the commission to fix a reasonable attorney's fee. Petitioner, however, in an effort to repel the charge that he did so intend to circumvent these provisions, denied that the contract, although typed, was ever executed, and declared that almost immediately after it was typed it was destroyed by him and that

he never acted under it. Such disclaimer removes the slightest justification that may have existed for the exaction of a fee such as was exacted in this case. For, if the petitioner did not act in reliance upon said contract, then payment for his services was not made upon a contingent basis pursuant to a contract entered into before the amount of services to be performed could be ascertained, but was paid after the services were performed and in full realization that the only legal services performed by him was the looking through the file of the proceedings of the industrial accident commission and ascertaining that an award had been made, and the further service, which cannot be designated as legal in any sense of the word, of accompanying McGee to the office of the insurance carrier and there identifying him. The service performed was so slight as scarcely to deserve the name of 'service,' And the receipt of money as payment for services when no service has been performed is certainly a species of dishonesty which no court could condone. We are satisfied that, had the client been in a position to know of his own knowledge the value of the services performed for him by the petitioner, he would have known that he was being grossly overcharged and would have refused to pay so large a proportion of his award for such slight service, and unless the petitioner misrepresented to him the value of his services, thereby overreaching one with whom he had confidential relations, petitioner could not have collected such a fee as he claims was 'voluntarily' paid to him. It is true that contingent contracts are justified and an attorney embarking upon litigation, especially where the outcome is uncertain is well within his rights in charging a substantial percentage of the amount recovered. This is so for the reason that such contracts are based upon the uncertainties of litigation, both as to the amount of service to be rendered in the future and as to the outcome of the litigation, and such contracts are entered into while yet these factors are indeterminable. The moment, however, a disclaimer is made that the services were

performed upon a contingent basis, we have the proposition that a fee of $310, out of an award of $882.96, was exacted by an attorney from a client admittedly of limited means for a most trivial service. We entertain no doubt that such a flagrant overreaching of a client amounts to misconduct on the part of an attorney such as would subject him to the disciplinary powers of this court. It was expressly so held in the case of *In re Cary*, 146 Minn. 80, 177 N. W. 801, 9 A. L. R. 1272, in an opinion in which we are in thorough accord.

"We do not feel that the conclusion reached by us places autocratic power in the hands of the Board of Bar Governors to supervise all the fees charged by attorneys for their services. Nor are we unduly apprehensive that the decision in this case will result in the Board of Bar Governors being deluged with complaints by disgruntled clients who believe that they have been overcharged for professional services. The power to suspend or disbar resides not in the Board of Bar Governors, but in the Supreme Court of the state, and the Board of Bar Governors has only the power to recommend, after careful and thorough examination into the facts, the action to be taken by this court.

"Although we are of the opinion that usually the fees charged for professional services may with propriety be left to the discretion and judgment of the attorney performing the services, we are of the opinion that if a fee is charged so exorbitant and wholly disproportionate to the services performed as to shock the conscience of those to whose attention it is called, such a case warrants disciplinary action by this court. In view of the facts of the instant case, we are of the opinion that the disciplinary action recommended by the Board of Bar Governors is not excessive." (*Goldstone v. State Bar of California*, 214 Cal. 490, 6 Pac. (2d) 513, 515, 80 A. L. R. 701.)

"Respondent further contends that the settlement with his clients upon a basis that was satisfactory to them is a defense to this information. We cannot assent to this view.

The relation of attorney and client is so intimate and the influence which the attorney has is so great that it would not do to establish the rule that any transaction to which it can be shown that a client has agreed must be regarded within proper professional bounds. Clients may be induced through stress of circumstances to agree to any settlement proposed, however unfair it may be, rather than resort to legal proceedings to obtain their rights. The fact that such settlement has been made will not preclude an inquiry into the moral and professional quality of the attorney's acts prior to and in connection with such settlement." (*People v. Chamberlin, supra;* and see *Champagne v. Benoit,* (R. I.) 78 Atl. 1009.)

Even though there has been a settlement between the attorney and his client it has been held to be no defense in disbarment proceedings. (*People v. Chamberlin, supra; In re Davies, supra; In re Rockmore,* 130 App. Div. 586, 117 N. Y. Supp. 512; *State v. Priest,* 123 Neb. 241, 242 N. W. 433.)

Though the services rendered by the attorney may be worth more than the amount fixed by the contract the attorney can recover only the amount so fixed, in the absence of a change in the contract. (*Neal v. Drainage Dist. No. 2,* 42 Ida. 624, 248 Pac. 22; *Reynolds v. Sorosis Fruit Co.,* 133 Cal. 625, 66 Pac. 21; *Lavenson v. Wise,* 131 Cal. 369, 63 Pac. 622; *Niagara Fire Ins. Co. v. Hart,* 13 Wash. 651, 43 Pac. 937; *Murray v. Trumbull & Trumbull,* 62 Wash. 336, 113 Pac. 769; *Duniway v. Hadley,* 91 Or. 343, 178 Pac. 942; *In re Prather's Estate,* 183 Cal. 314, 191 Pac. 521; 15 Am. & Eng. Ency. of Law, 2d ed., p. 1078.)

"We think the rule in cases of this kind is well stated in *Isham v. Parker,* 3 Wash. 755, 767, 29 Pac. 835, 839, to the effect that when an attorney performs any unusual professional services—'where there was no further understand-'ing or request, and where there was nothing to show that it was understood by the client that such services were outside of or in addition to the services provided for by the contract

of employment, the attorney should be precluded from re-covering in excess of the contract price.'

"It was the duty of the attorney, at the time these ser-vices for which he claims extra compensation were being performed, to notify his client that such services were with-out the contract of employment, and in the absence of such information he ought not to recover therefor." (*Gabrielson v. Gorin,* 92 Wash. 408, 159 Pac. 387.)

■ The rule holding a person in a fiduciary capacity to the strictest accountability applies to agreements for in-creased compensation after the confidential relationship is inaugurated.

"The burden is upon counsel to show that the new con-tract was fairly made, was reasonable, and that no advantage was taken by reason of the confidential relation existing be-tween counsel and client." (6 C. J. 737.)

And see *Dryenforth v. Palmer Pneumatic Tire Co.,* 240 Ill. 25, 88 N. E. 290; *French v. Cunningham,* 149 Ind. 632, 49 N. E. 797; *Blaikie v. Post,* 139 App. Div. 648, 122 N. Y. Supp. 292; *Ringen v. Ranes,* 263 Ill. 11, 104 N. E. 1023.

■ With regard to the "Klans matter" the board re-solved the conflict in the evidence against petitioner. They heard the testimony and saw the witnesses and under the status of the record were justified in making the finding (4 C. J. 780; *In re Ryan,* 46 Mont. 289, 127 Pac. 904; *In re Griggs,* 74 Mont. 373, 240 Pac. 820; *In re Schulte,* 114 Okl. 115, 243 Pac. 933; *In re McCue,* 80 Mont. 537, 261 Pac. 341, 344; *In re Grorud,* 84 Mont. 221, 275 Pac. 1098), which sus-tains the conclusion that, since petitoner has retained the whole $40, and at most was entitled to only one-half of it, he violated subd. 5, sec. 3–301, *supra.*

Section 3–408, I. C. A., provides that this court may in such proceedings enter such judgment as it deems proper. (*In re Edwards, supra; In re Cohen, supra.*)

"The serious question presented is the extent of the dis-cipline that should be inflicted. Contracts as to the attor-ney's compensation between attorneys and clients are now

made lawful by statute and, although the courts have been seriously concerned with the abuses that constantly flow from allowing such contracts to be made, the conditions existing at the present time seem to make it necessary that such contracts should be made legal and enforced. It is the duty of the courts, however, to minimize as much as possible the dangers and disadvantages resulting from the enforcement of such contracts, and to hold the attorney to the strictest good faith in his relations to his client based upon such contracts. Here the respondent undertook the prosecution of this case under a written retainer which was perfectly plain upon its face. The attorney and client at the beginning fixed the fee which the attorney was to receive, and any attempt by subterfuge or deceit to obtain a greater sum than that which the parties agreed should be fixed for the services to be rendered should be promptly and summarily dealt with by the courts.

"It seems to me there has been a gross abuse by the attorney in his relations with his client, a gross attempt to impose upon his client, and both in the proceedings before the Supreme Court and in this proceeding an attempt to inject an agreement with his client which was never made. We cannot overlook such professional misconduct. But under all the circumstances, instead of imposing the extreme penalty of disbarment, we will suspend this respondent from practice for two years, and until the further order of this court, with leave to the respondent to apply for reinstatement at the expiration of such period upon showing that he has actually abstained from practice and has otherwise properly conducted himself." (*In re Smith, supra.*)

In *State v. Barto, supra,* the attorney was disbarred for attempting to compel the payment of an extortionate fee.

In *People v. Green, supra* (where the attorney converted the client's funds to his own use), the court said:

"The conduct complained of was unprofessional and dishonorable. It denotes lack of good moral character, calculated to bring discredit on the court and tarnish the good name of the legal profession. A lawyer is an officer of the

court—a minister in the temple of justice. His high calling demands of him fidelity to his clients with an eye single to their best interests, as well as good faith and honorable dealing with the courts and the public in general. The testimony shows that the respondent does not possess that sense of duty and his offenses have been numerous and grave.

"The rule will be made absolute and the name of respondent will be stricken from the roll of attorneys of this court."

In *In re Goldstone v. State Bar of California, supra,* the attorney was suspended for three months.

In *People v. Chamberlin, supra,* the attorney was disbarred.

From a reading of the transcript and a careful consideration of the record the court is of the opinion that three months' suspension is insufficient and the petitioner should be suspended for a year. (6 C. J. 612; *Herron v. State Bar of California,* 212 Cal. 196, 298 Pac. 474, 297 Pac. 19; *Mills v. State Bar of California,* 211 Cal. 579, 296 Pac. 280; *D'Elia v. State Bar of California,* 212 Cal. 770, 300 Pac. 826; *State v. Parker,* 120 Or. 465, 252 Pac. 711; *In re Sampley,* 160 Wash. 92, 294 Pac. 1118; *In re Tyron,* 209 App. Div. 793, 205 N. Y. Supp. 423; *Green v. State Bar of California,* 210 Cal. 603, 292 Pac. 638; *In re McKee,* 197 App. Div. 192, 188 N. Y. Supp. 753; *People v. Harris,* 273 Ill. 413, 112 N. E. 978; *People v. Winograd,* 87 Colo. 384, 287 Pac. 864; *People v. Hillyer,* 88 Colo. 428, 297 Pac. 1004; *In re Kaas,* 39 S. D. 4, 162 N. W. 370.)

Thus modified the order of the Bar Commission is affirmed, and judgment of suspension for a year is hereby ordered entered. Due notice thereof to be given the Bar Commission, petitioner and all of the district courts of the state. Such suspension to date from the final entry of this opinion and judgment herein.

Budge, C. J., and Morgan, Holden and Wernette, JJ., concur.