**In re Jared B. STAMELL Debtor.**

**Jared B. Stamell, Plaintiff,**

**v.**

**Kirkpatrick & Lockhart, LLP and Gerald A. Novack and W. Shaw McDermott, Trustees of the Kirkpatrick & Lockhart Nominee Trust, Defendants.**

**Bankruptcy No. 196–10614–260.**
**Adversary No. 197–1471–260.**

United States Bankruptcy Court,
E.D. New York.

Aug. 17, 2000.

Robinson Brog Leinwand, Greene, Genovese & Gluck, P.C., By David C. Burger, New York, for Debtor.

Kirkpatrick & Lockhart LLP, By Loren Schechter, New York, for Defendants.

MEMORANDUM OPINION

CONRAD B. DUBERSTEIN, Chief Judge.

The issue before this Court is whether Jared B. Stamell ("Stamell," "Debtor," or "Plaintiff"), the Debtor in this bankruptcy case, is liable for legal fees incurred by his wife, Susan Frank (her maiden name) ("Susan"), to her attorneys, Kirkpatrick & Lockhart, LLP ("K & L"), which represented her in a criminal case where she was a defendant, payment of which was guarantied by the Debtor. In order to stay a foreclosure sale by Citibank, a secured creditor in this proceeding holding mortgages on both the Debtor's residence and property owned by him on Martha's Vineyard, Massachusetts (the "Vineyard Property"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, which case was assigned to, and is pending before, the undersigned. K & L filed a claim in this case for the payment of its fees, which claim was secured by a mortgage also on the Vineyard Property. By initiating the within adversary proceeding, the Debtor, as Plaintiff, has sought to have the claim disallowed and expunged, not only as to its amount, but also on the grounds that the guaranty was executed under duress and coercion and thus is void and of no effect. As hereinafter appears, other areas of relief were sought and counterclaims asserted, which will be discussed.

After 20 days of the trial of the issues raised in this proceeding, followed by unsuccessful attempts at settlement, and upon the record taken during the trial and the memoranda of law submitted by the

parties, and after due consideration, this Court concludes that the guaranty is valid. It will now arrange to hold hearings in order to examine into and fix the amount of the claim for the fees and expenses.

On January 24, 1996, Stamell filed his petition for relief under Chapter 11 of the Bankruptcy Code. The instant adversary proceeding was instituted by him against K & L and Gerald A. Novack and W. Shaw McDermitt, Trustees of the Kirkpatrick & Lockhart Nominee Trust (collectively "Defendants"). In addition to seeking judgment denying K & L's claim in its entirety, the complaint also seeks to reclassify any portion of the claim that is not denied, as an unsecured claim, rather than secured on the ground that the K & L mortgage is void. The basis for relief as set forth in the complaint are: (1) violation of the New York Code of Professional Responsibility including Disciplinary Rules 2–110(A), 6–101(A)(3) and 7–101(A)(1–3); (2) breach of fiduciary duty; (3) duress; (4) lack of consideration; (5) breach of contract; (6) receipt of full payment; and as already noted, (7) a declaration that K & L's mortgage is void. Defendants filed an answer on November 12, 1997 denying the allegations contained in the complaint, as well as asserting two counterclaims: (1) seeking a declaration fixing and determining fees owed to K & L as attorneys in the criminal proceeding; and (2) seeking a declaration that K & L's claim against Stamell be deemed a secured and allowed claim. Plaintiff filed a reply to the counterclaims on December 1, 1997. Thereafter, this court conducted an extensive trial. Following the trial on the issues, the parties submitted post-trial memoranda of law as well as replies to each other's respective post-trial memoranda of law. This memorandum opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. FED. R. BANKR. P. 7052.

## FACTS

In May of 1993, Stamell's wife, Susan, and her sister, Jane Frank Kresch ("Jane") (collectively the "Frank Sisters"), consulted Michael F. Armstrong ("Armstrong"), then with the law firm of Lord Day & Lord, Barrett Smith ("Lord Day"), about legal representation with respect to a criminal investigation being conducted by the United States Attorney's Office in the Eastern District of New York. The investigation centered upon alleged environmental violations committed by business enterprises in the New York Harbor area, including those in which Susan and Jane were principals.

A grand jury conducted the investigation and it resulted in the issuance of an indictment, dated July 1, 1993, by the United States in the District Court of the Eastern District of New York against the Frank Sisters, other family members and certain Frank company employees (*U.S. v. Frank* (93 Cr. 706)) (the "Criminal Prosecution"). The indictment alleged a conspiracy to defraud the United States by hiding oil sludge contaminated with polychlorinated biphenyls ("PCBs") on the barge Nathan Berman and a conspiracy to commit mail fraud by billing for the lawful disposal of sewage sludge when not all of the sewage sludge was lawfully disposed of.

On or about August 17, 1993, a letter containing terms of retention of Lord Day was executed by Susan and Jane, and by Armstrong and Howard B. Epstein as partners on behalf of Lord Day (the "First Retainer"). Under the terms of the First Retainer, Susan was liable for all reasonable attorneys' fees and disbursements incurred in her defense in the Criminal Prosecution, and Jane was liable for all reasonable attorneys' fees and disbursements incurred in her defense in the Criminal Prosecution. Fees were to be paid on the basis of regular time charges. A note from a buyout of one of the Frank businesses that provided for a monthly pay down at a set amount was assigned to

Lord Day in order to establish an escrow account to defray legal expenses on a current basis. As expressly contemplated by the terms of the First Retainer, Armstrong left Lord Day to become a partner of K & L in October 1993. Almost all of the attorneys and staff working on the Criminal Prosecution also left Lord Day to join K & L, so that the work for the Frank Sisters continued uninterrupted.

Over the next year and several months, a team consisting of Armstrong, another partner specializing in environmental issues, several associates, several paralegals and various others on a part-time basis devoted themselves to: (1) discovery efforts examining a massive amount of documents in the possession of the government; (2) selecting, reproducing and organizing an equally substantial number of such documents that were relevant to the defense of the case; (3) lengthy negotiations with government attorneys; (4) extensive motion practice dealing with, among other things, complex environmental issues of law; (5) investigation of numerous factual circumstances and situations that were possibly pertinent to pretrial motion practice or the defense during the trial itself; (6) preparation of a motion and a possible hearing involving possible violations of the Frank Sisters' constitutional rights in the course of a raid conducted by New Jersey environmental authorities; (7) interviewing many witnesses of potential value in pretrial motions or at trial; (8) meetings with potential expert witnesses; (9) intensive legal research on a number of crucial issues; and (10) attending to a variety of requests by the Frank family for related legal services. Pre-bills, which set forth current time charges and disbursements, were given to the clients on a regular basis, usually every week or two.

These efforts were conducted in close coordination with the Frank family, primarily the Frank Sisters. Space was set aside at the Lord Day premises and, later, the K & L premises to accommodate not only the voluminous files relevant to the case but for work space needed by the Frank Sisters in examining and providing K & L with documents pertinent to their defense. The clients maintained almost daily contact with Armstrong and his colleagues.

In September of 1994, the note, proceeds of which had been assigned to K & L that had been providing for the monthly pay downs for the payment of legal fees and expenses was paid in full and, therefore, no longer a source of funds to defray such fees and expenses.

Beginning in or about October 1994, Armstrong and his colleagues at K & L told Susan and her husband, Stamell, the Debtor herein, and Jane and her husband, Dr. Richard Kresch ("Kresch"), that a new retainer agreement was necessary in connection with the continued representation relating to the Criminal Prosecution.

On November 4, 1994, Honorable Edward R. Korman, the District Court Judge to whom the case was assigned and who presided over the trial, ruled that the indictment would be bifurcated into two trials, with the PCB charges to be tried first (the "First Trial"), and the mail fraud charges to follow (the "Second Trial"). Armstrong, on behalf of K & L, entered a notice of appearance for Susan, Jane and their brother, Peter Frank ("Peter"), dated November 4, 1994.

Beginning in November 1994, K & L and the Franks negotiated a guaranty and retainer agreement to cover the payment of legal fees. Armstrong and his trial team devoted their attentions to preparing for trial while Armstrong's colleague and partner, Martin Richman, handled the task of memorializing agreements which included guaranties to be executed by Stamell and Kresch. After considerable negotiations, a first draft of the guaranty and retainer agreement was circulated to the clients and guarantors on November 23, 1994. Thereafter, many telephone conferences were held, letters were exchanged and it appears that about ten drafts of the

agreement and guaranties were circulated between November 1994 and January 1995.

On or about January 25, 1995, a Retainer, Non-Recourse Guaranty and Security Agreement (the "Second Retainer") was executed by: (a) Susan, Jane and Peter as clients; (b) Stamell and Kresch as guarantors; and (c) K & L by Armstrong. The Second Retainer also applied to the representation provided by two attorneys, Neil Hurwitz ("Hurwitz") and Paul Rooney ("Rooney"), for co-defendants of the Frank Sisters. The co-defendants that Rooney and Hurwitz separately represented were Frank employees whose legal fees the Frank Sisters had agreed to pay. The parties to the instant action agree that the Second Retainer replaced the First Retainer.

Pursuant to the terms of the Second Retainer, the obligations of Stamell and Kresch as guarantors were not to exceed, collectively, the amount of $1,850,000 (plus a contingent amount of up to $150,000 if K & L incurred collection costs with respect to realizing upon its security). Stamell granted a mortgage on the Vineyard Property, consisting of sixty acres of oceanfront property owned by him located on Martha's Vineyard. The mortgage ran to the K & L Nominee Trust, a trust created by K & L in order to secure the obligations of Stamell. The $1,850,000 guaranty pursuant to the terms of the Second Retainer has been reduced by payments by Kresch and Stamell and is now in an amount no greater than $1,482,500 (exclusive of the $150,000 claimed for collection costs). Additional payments have been made by Kresch in the amount of $123,544.88 which Stamell contends further reduce the guaranty to $1,358,955.12, but which K & L contends do not reduce the guaranty.

Jury selection for the First Trial commenced on January 30, 1995. Prior to the actual trial, the court dismissed the substantive environmental counts. On April 4, 1995, the jury returned verdicts of acquittal for the Frank Sisters on the remaining conspiracy count.

Parenthetically, it is to be noted that in an action instituted in the United States District Court for the District of Puerto Rico, on or about April 6, 1995, the court there issued a restraining order which, in relevant part, restrained the Frank Sisters and Stamell from disposing of certain assets, including the Vineyard Property. That action arose out of damages sustained to a beach located in Santurce, Puerto Rico, caused by oil spillage from a barge and tugboat rented by one of the Frank companies, of which the Frank Sisters were principals, to an entity in Puerto Rico which gave rise to a lawsuit brought by the Commonwealth of Puerto Rico against members of the Frank family and others.

On July 28, 1995, K & L rendered a formal bill to Susan and Jane in the amount of $1,460,109.97. This represented actual time and disbursements, including a past-due invoice of $366,885.00, of which the Frank Sisters had only paid $120,000 and included a $50,000 discount to accommodate some objections Susan had made. The bill reflected total time expended by K & L's lawyers and paralegals to be 4,468.50 hours.

During the summer and fall of 1995, relations between K & L and the Franks became increasingly strained. K & L was concerned about getting paid for the legal work thus far done, and discussed with the Franks the possibility of their retaining other lawyers for the Second Trial. During the course of hearings before this Court, K & L alleged that Stamell indicated to K & L that the Vineyard Property would be sold to pay the fees in the near future.

In October of 1995, Judge Korman held hearings in an attempt to deal with the issue of an asserted lien by the Commonwealth of Puerto Rico affecting the Vineyard Property arising out of the damages caused by the oil spillage so that the Frank Sisters could afford to pay for rep-

resentation at the Second Trial. K & L claims that as far back as June 30, 1995 when it was not restrained from pursuing its remedies under the guaranty and therefore had been entitled to commence foreclosure proceedings against the Vineyard Property, it had foregone doing so allegedly on Stamell's representation that he intended promptly to sell the property and that foreclosure proceedings would interfere with his getting a maximum return. The property was never sold.

In December of 1995, Armstrong applied to Judge Korman to be relieved as K & L's counsel for the Frank Sisters in connection with the Second Trial. In light of their failure to pay the accrued legal fees thus far, Armstrong contended that it was not fair that he be required personally to take part in the trial. He further represented that qualified colleagues, who had assisted at the First Trial, would continue to represent both Susan and Jane. Judge Korman granted Armstrong's application, over their objections.

In late December of 1995, the case was transferred to the Honorable Jack B. Weinstein. In hearings before Judge Weinstein on January 23 and January 24, 1996, the Frank Sisters asked for reconsideration of Judge Korman's order excusing Armstrong from the case. Both submitted affidavits strongly maintaining that they wanted Armstrong to be involved personally. Judge Weinstein ordered Armstrong to appear at trial.

At the January 24, 1996 hearing, Judge Weinstein ordered the Frank Sisters not to dispose of any assets whatsoever until their legal fees were paid. This oral order was followed up by a written one, dated June 17, 1996, on which Judge Weinstein penned in a requirement that the Frank Sisters spend no more than $200 each per week on personal expenses.

In or about January of 1996, Armstrong, on behalf of K & L, informed the Frank Sisters, Kresch and Stamell that modifications to the Second Retainer were necessary, including, but not necessarily limited to, an increase in the amount of security for payments under the Second Retainer.

In late January of 1996, K & L was preparing foreclosure proceedings with respect to the Vineyard Property. Citibank, another creditor with its own security interest in the property as well as the Debtor's residence, was on the verge of commencing its own foreclosure action. As has been previously observed, on January 24, 1996, Stamell initiated this instant bankruptcy case, utilizing the automatic stay to forestall the foregoing foreclosure actions. The bankruptcy filing made it necessary to obtain this Court's approval to include Stamell in the proposed modification to the Second Retainer, then being negotiated, to cover the Second Trial.

Consequently during the period from March 7 through March 12, 1996, a memorandum of understanding was executed by Stamell, the Frank Sisters, and K & L by Armstrong which modified certain terms of the Second Retainer ("Stamell's MOU"); a separate memorandum of understanding was executed by Kresch, the Frank Sisters, and K & L by Armstrong which modified certain terms of the Second Retainer ("Kresch's MOU"). Stamell's MOU included his further guaranty in the additional amount of $1,000,000 (plus certain contingent amounts) to be secured by an additional mortgage for that amount on the Vineyard Property. It expressly stated that: "Jared's obligations hereunder and the new mortgage are subject to the approval of the Bankruptcy Court [having jurisdiction over Jared's bankruptcy proceeding]." (Pl.'s Ex. 22 at p. 4.) [1]

On March 13, 1996, the second trial began before Judge Weinstein. On April 1, 1996, the Frank Sisters were convicted on

1. References to the trial exhibits are as follows: "Pl.'s Ex. __ at p. ——" refers to Plaintiff's exhibits; "Defs.' Ex. __ at p. ——" refers to Defendants' exhibits; and references to the trial transcript are in the form "[witness], Tr. [date] at p. ——."

charges that they were involved in short dumping of sewage in New York harbor.[2]

According to the terms of Stamell's MOU, on May 13, 1996 K & L filed a motion before this Court seeking, *inter alia,* approval of the MOU. On June 21, 1996, Stamell filed opposition papers to K & L's motion. At a hearing on the motion held on June 27, 1996, this Court denied K & L's motion on the grounds that there is no authority in the Bankruptcy Code for a bankruptcy court to approve a mortgage to secure services that had already been rendered; it subsequently signed an order to that effect on March 16, 1999. A motion later made by K & L for the allowance of a claim for an administrative expense for services rendered subsequent to the filing of this Chapter 11 case was denied by this Court's order, dated March 18, 1999.[3]

In or about August of 1996, Kresch's interest in a nursing home known as the Montgomery Nursing Home ("Nursing Home") was sold for approximately $1,600,000. At that time of the sale, pursuant to the terms of the Second Retainer and Kresch's MOU, K & L had a security interest in Kresch's interest in the Nursing Home in the amount of approximately $1,800,000. On or about August 27, 1996, K & L and Kresch executed an agreement pursuant to which K & L agreed to release its security interest in Kresch's interest in the Nursing Home in exchange for a payment of $250,000. It also released Kresch, as a guarantor from "any further obligations under the [Second Retainer] (except any right to any property previously, currently or in the future held in Jane Frank Kresch's name alone ....)" (Pl.'s Ex. 79 at p. 2.) However, this did not release Kresch from all of his obligations under his MOU.

On August 29, 1996, K & L, Rooney and Hurwitz filed a motion before Judge Weinstein for the fees that were owed to them (the "Fee Motion"). Bills and time sheets were submitted to the court as exhibits. K & L requested $2,924,073.80 in fees and disbursements, which included fees for Rooney and Hurwitz. The balance due on Rooney's final bill after the first trial was $231,000.00; Hurwitz's balance due was $121,880.40. Pursuant to the Second Retainer, Rooney and Hurwitz agreed to cap their fees at a total for both of them at $325,000. Under this cap, they were owed $245,000 ($165,000 to Rooney and $80,000 to Hurwitz). Thus, Rooney and Hurwitz had offered to reduce their bills by $66,000 and $42,000 respectively, and did so in the expectation that their reductions would result in swift payments in return for their rendered services.

The Frank Sisters filed answering papers to the Fee Motion, objecting to Judge Weinstein's consideration of the motion. The motion was adjourned until after the sentencing date for the Frank Sisters. It was renewed on December 3, 1996. On December 4, 1996, Judge Weinstein referred the motion to the undersigned by reason of Stamell's bankruptcy case pending before me. I agreed to consider the motion in a letter order dated December 16, 1996 addressed to Judge Weinstein.

It is undisputed that K & L has previously received a total of $935,108 in connection with defense of the Criminal Prosecution, comprised of $493,758 for legal fees, $381,350 for disbursements, and $60,000 for legal fees of other defense counsel. K & L has filed a proof of claim for its legal services rendered amounting to $2,632,500.

During the time this case has been before the undersigned, both Stamell and K & L have filed plans of reorganization which have been amended from time to

2. Their convictions were affirmed on September 15, 1998, *U.S. v. Frank,* 156 F.3d 332 (2d Cir.1998); the United States Supreme Court denied *certiorari* on March 22, 1999, 526 U.S. 1020, 119 S.Ct. 1257, 143 L.Ed.2d 353.

3. Appeals of both the order denying K & L's motion for approval of Stamell's MOU and the order denying K & L's motion for administrative priority are presently pending before Judge Weinstein in the District Court.

time. The plans have not been solicited to the creditors for their consideration by reason of the pending issues presently before this Court.

Following a lengthy trial of the issues in the adversary proceeding, extensive settlement negotiations ensued, during which I suspended the due date for post-trial briefs for both sides. After having set May 14, 1999 as the final date to file the post-trial briefs, on May 5, 1999, Stamell moved by order to show cause to stay the proceedings and dismiss the within bankruptcy case. K & L strenuously opposed the motion to dismiss. While the consideration of the motion was pending, Stamell settled the claims of two of his substantial creditors: the Internal Revenue Service and the New York State Department of Taxation and Finance.

On October 19, 1999, Stamell withdrew his motion to dismiss this bankruptcy case. After a last attempt at settlement negotiations which failed, on February 3, 2000, I directed that the dates be reset for post-trial briefs to be due. The following discussion and conclusion is based upon all the testimony, arguments, and papers submitted to this Court.

## DISCUSSION

### I. Jurisdiction

This Court has jurisdiction over the instant matter pursuant to 28 U.S.C.A. §§ 157 & 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges for the Eastern District of New York, dated August 28, 1986.

This adversary proceeding insofar as it deals with the issue of a claim against this bankruptcy estate based upon a guaranty and seeking a determination of the existence and extent of a lien on estate property is a core proceeding that falls within 28 U.S.C.A. § 157(b)(2)(A), (B), (C), (H), (K) and (O).

The motion for the determination of fees originally brought before Judge Weinstein and referred to this Court will be addressed by this Court following the issuance of this opinion which is limited to the validity and maximum scope of Stamell's guaranty.

### II. The Retainers and Memoranda of Understanding

1. First Retainer

As discussed earlier in this opinion, the First Retainer was executed on or about August 17, 1993 by the Frank Sisters, and by Armstrong and Howard Epstein on behalf of Lord Day. The First Retainer does not contain a guaranty provision and Stamell did not sign it. Therefore, it is conceded that Stamell has no liability under this First Retainer. In addition, the parties agree that the Second Retainer replaced the First Retainer.

2. Second Retainer

As discussed earlier, beginning in or about October 1994, Armstrong and/or K & L told the Frank Sisters and their respective husbands, Stamell and Kresch, that a new retainer agreement was necessary in connection with the representation relating to the Criminal Prosecution. K & L alleges that the Frank Sisters, and their brother Peter, assured it that legal fees would be paid promptly and in full. Susan allegedly stated that the Vineyard Property which was owned by her husband would be the source of funds to pay legal expenses. Stamell's Summary of Schedules, filed in the instant bankruptcy case, lists the Vineyard Property as being worth $4,000,000.00.

K & L's main argument in justifying the validity of the Second Retainer is that it was based upon valid contractual documents that were properly bargained for consideration and which obligates Stamell to pay K & L's outstanding legal fees and expenses. It contends that the consideration Stamell received in return for his guaranty was that his wife would continue to enjoy services over and above that

which K & L was ethically required to provide as counsel.

Stamell contends that the Second Retainer was a mid-stream modification and as such, K & L had to abide by the ethical requirements involved. He argues that the Court must use a three step approach to determine the propriety of a mid-stream modification to a retainer agreement. This three step approach is based upon the Restatement of Law Governing Lawyers 3d § 29A, Comment e, as well as an article written by Brian J. Redding, appearing in Litigation Ethics. The burden K & L must allegedly prove, according to Stamell, is:

> First, the lawyer must show that the client was adequately aware of the effects and any material disadvantages of the proposed agreement, including, if applicable, circumstances concerning the need for modification;
>
> Second, the lawyer must show that the client was not pressured to accede in order to avoid the problems of changing counsel, alienating the lawyer, missing a deadline or losing a significant opportunity in the matter, or because a new lawyer would have to repeat significant work for which the client owed or had paid the first lawyer; and
>
> Third, the lawyer must show that the agreement was fair and reasonable, under all the circumstances.

(Pl.'s Post–Trial Mem. of Law at p. 28.); *See Restatement of the Law Governing Lawyers* 3d § 29A, Comment e at 42–43; Brian J. Redding, *Changing Fee Arrangements In Midstream: What Are The Issues?*, LITIGATION ETHICS, Fall/Winter 1997, at 6.

The foregoing is only persuasive authority on the state of the law inasmuch as no controlling case law is given by Stamell that specifically supports the three step approach. As attorneys admitted to practice in the state of New York, Armstrong and his colleagues at K & L who were involved in drafting the retainer agreements were governed by the New York Code of Professional Responsibility which does not provide such specific criteria to be followed in the instant factual situation where a retainer has been signed after representation has begun and that new retainer replaces an earlier one.

During the trial, Stamell called upon Professor Roy D. Simon ("Professor Simon"), as an expert witness in the area of ethics. The three step approach provided by the Restatement, and clearly endorsed in the testimony of Professor Simon, specifically addresses the instant factual situation. However, as has been previously noted, there is no controlling case law in support of the specific three step approach in this Circuit.

New York law must be examined in order to determine what steps K & L was required to take, namely as provided for by the Code of Professional Responsibility as well as whatever New York case law may exist that bears upon this particular situation. The Code of Professional Responsibility does not have a provision directly on point. However, its Disciplinary Rule ("DR") 5–104(A) appears to be the most applicable provision to the instant situation. DR 5–104(A) provides that:

> (a) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless:
>
> (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and fully disclosed and transmitted in writing to the client in a manner that can be reasonably understood by the client;
>
> (2) The lawyer advises the client to seek the advice of independent counsel in the transaction; and
>
> (3) The client consents in writing, after full disclosure, to the terms of the transaction and to the lawyer's inherent conflict of interest in the transaction.

N.Y. DR 5–104(A). Stamell claims that this section was breached because K &· L used the leverage of its position to condition its representation of Stamell's wife on his execution of the guaranty. This Court does not agree.

■ The three step approach offered by Professor Simon, while detailed, is not the state of the law in New York at this time. New York case law applies DR 5–104(A) to situations similar to the instant case and requires a lesser standard than the three step approach from the Restatement, specifically: (a) the terms must be fair and reasonable to the client; and (b) the terms must be disclosed and understood to the client. *See Baye v. Grindlinger,* 78 A.D.2d 690, 432 N.Y.S.2d 624 (N.Y.App.Div.1980); *In re Matter of Schanzer,* 7 A.D.2d 275, 182 N.Y.S.2d 475 (N.Y.App.Div.1959). This analysis comports with the requirements of DR 5–104(A) because the client would be getting the necessary disclosure for it to understand the terms.

In *Baye,* the appellate division, in reversing a New York Supreme Court's decision to grant summary judgment stated:

> The rule is well established that as to contracts made between an attorney and his client subsequent to employment which are beneficial to the attorney, it is incumbent on the attorney to show that the terms are fair and reasonable and fully known and understood by the client (*Matter of Howell,* 215 N.Y. 466, 472, 109 N.E. 572; *Matter of Schanzer,* 7 A.D.2d 275, 278, 182 N.Y.S.2d 475, affd. 8 N.Y.2d 972, 204 N.Y.S.2d 349, 169 N.E.2d 11; *Cohen v. Ryan,* 34 A.D.2d 789, 790, 311 N.Y.S.2d 644; *Matter of Potenza,* 29 A.D.2d 213, 216, 287 N.Y.S.2d 138; *Matter of Vaupel,* 266 A.D. 723, 40 N.Y.S.2d 956).

*Baye,* 78 A.D.2d at 690, 432 N.Y.S.2d at 625. See *In re Karp,* 240 A.D. 388, 395–96, 270 N.Y.S. 113, 121 (N.Y.App.Div.1934), *aff'd* 266 N.Y. 473, 195 N.E. 160 (1934) (lawyer censured for unethical conduct in demanding additional fee just before hearing). In enumerating this rule of law, the court in *Baye* denied a summary judgment motion finding that there were questions of fact regarding, among other issues, whether the client had understood the import of the transactions with her attorney at the time. *Baye,* 78 A.D.2d at 690, 432 N.Y.S.2d at 625.

In *Shaw v. Manufacturers Hanover Trust Co.,* 68 N.Y.2d 172, 507 N.Y.S.2d 610, 499 N.E.2d 864 (1986), the New York Court of Appeals applied the earlier quoted standard against the attorney's conduct in the case before it. In that case, the client, in order to retain new counsel for the appeal, was forced to negotiate a second agreement with his original attorney because at the time a quantum meruit lien had been imposed by that attorney who was claiming the client owed him several thousand dollars in expenses and refused to release the files. *Id.* at 179, 507 N.Y.S.2d 610, 499 N.E.2d 864. The court declared:

> [C]ourts as a matter of public policy give particular scrutiny to fee arrangements between attorneys and clients, casting the burden on attorneys who have drafted the retainer agreements to show that the contract are fair, reasonable, and fully known and understood by their clients.

*Id.* at 176, 507 N.Y.S.2d 610, 499 N.E.2d 864. The court found that based upon the facts of the case, the attorney was not entitled to a fee because the initial retainer was construed by the court as to terminate upon the entry of an adverse judgment against the client, and that as it provided for the attorney to determine his fee by the sum recovery without any provision for expenses, and nothing had been recovered, the client was not obligated to pay the attorney any fee at all. *Id.* at 177, 507 N.Y.S.2d 610, 499 N.E.2d 864.

In the present case, the terms of the Second Retainer were fair and reasonable by virtue of the fact that they were not altering the First Retainer in the amount of the fees to be charged. Concerns were

raised that the First Retainer provided that the Frank Sisters would be billed separately for fees so that Susan would only be responsible for fees incurred in her own defense and Jane would likewise only have to pay for her own charges. However, K & L explained through the testimony of Neil Hurwitz that as trial preparation progressed, it was apparent that the cases overlapped so much that it didn't make sense to bill time separately, and Stamell has not refuted this. (Hurwitz, Tr. 7/29/98 at p. 47.) Therefore, as a practical matter, it was reasonable to have the Second Retainer reflect how the case was actually being worked on.

The Second Retainer expanded the representation to include attorneys representing two Frank company employees that the Frank Sisters had agreed to pay for their legal defenses. As this was something that the Frank Sisters had agreed to take on and has not been denied, it was fair and reasonable to document it in writing.

The significant addition in the Second Retainer that did not appear in the First Retainer was the inclusion of guaranties by the Frank Sisters' spouses, Kresch and Stamell. These guaranties were not given by the clients and therefore there is no need to see whether they were fair and reasonable as to the clients because they were not directly affected by those guaranties. The clients themselves had nothing to lose by having guarantors of their debts, and in fact everything to gain if they personally ended up not having to pay the legal fees by virtue of the guaranties being exercised.

The second part of the criteria used by New York courts is that the terms must be disclosed and understood by the client. In the instant case, there were two months of negotiation over the terms of the Second Retainer. (Pl.'s Pre–Trial Order, Undisputed Facts 5 & 8.)[4] The multitude of correspondence submitted to this Court as exhibits showing the progression of the drafts of the Second Retainer evidence a thorough digestion of the terms by all the parties involved. (Pl.'s Exs. 6, 9, 11, 12, 13, 14, 15, 18, 20.) And in fact, even discounting the testimony of Martin Richman, one of the primary draftsman of the Second Retainer for K & L, that the clients were urged to get independent counsel to review the Second Retainer as being self-serving, it remains a fact that the circulated drafts stated that the clients had sought advise of outside counsel, which language was ultimately modified at Stamell's insistence, but still read that the clients had been advised to seek independent counsel. (Richman, Tr. 6/17/98 at p. 67.)

K & L does not refute the standards given by Professor Simon in court. In support of its argument, it called upon its own expert, Professor Geoffrey C. Hazard ("Professor Hazard"), of the University of Pennsylvania, to testify on its behalf. However, he never actually testified as to what steps a law firm must take ethically to demand a change in its original retainer. He did testify that where a lawyer is not getting paid, he is allowed to ask how the client intends to pay and to ask for security for that payment. (Hazard, Tr. 8/12/98 at pp. 10–11.) But although he also testified that there would be a breach of contract by a client in not paying the bills if there were fees overdue by 90 days where bills were submitted monthly, it was then established that at the time the Second Retainer was executed, the clients had no bills outstanding for over 90 days. (Hazard, Tr. 8/12/98 at pp. 32, 55.) He also testified that there was no indication of coercion in the execution of the guaranty, as claimed by Stamell, that the Second Retainer was the result of extensive communication over at least 2 months time, and the fact that Stamell himself was an

4. The Plaintiff, following this Court's direction, filed a Pre–Trial Order which included, among other items, numbered facts not disputed by the parties involved, which are referred to in this opinion as "Undisputed Fact [number]."

attorney lessened the chance of coercion. (Hazard, Tr. 8/12/98 at pp. 101–103.)

Stamell's claim of breach of fiduciary duty must arise from his contention that K & L failed to follow DR 5–104(A) as interpreted by New York courts. However, since it has now been determined that K & L satisfied the requirements of DR 5–104(A) and New York case law, this court concludes that there was no breach of fiduciary duty.

K & L adds to its argument by demonstrating Stamell's alleged willingness to use the Vineyard Property to pay its fees, citing documents revealing instances where Stamell represented to various courts, including the District Court and this Court that he intended to use the Vineyard Property to pay K & L its fees. Most recently, in a habeas corpus proceeding filed in the District Court by Susan seeking to set aside her conviction, Stamell, acting as her lawyer in a pleading filed by him in those proceedings, referred to the government's interference with his pledge of the Vineyard Property to pay for his wife's defense. That motion stated in part that Stamell had already mortgaged the Vineyard Property to pay Susan's defense in the first trial. (Defs.' Post–Trial Br. at p. 7 (citing 28 U.S.C. § 2255 Mot.)) In addition, K & L points to Stamell's statement to Judge Korman at a hearing in October 1995, where Stamell said:

> I have a piece of property that is being held up in an inconvenient place for me to have to try to go down and litigate it.
>
> I thought there was an agreement that Kirkpatrick & Lockhart had obtained earlier. The Government's position has changed, and now, with very little time remaining, there is not a great deal of opportunity for me to engage or afford to engage in litigation to free up the property so that Kirkpatrick & Lockhart feels comfortable that they can give the kind of defense that my wife is entitled to because I want to pay for it.

(Defs.' Ex. 116 at pp. 7–8.) At that same hearing, Stamell also stated, "I own a piece of property. I paid for a piece of property. And I want to use it for my wife's defense." *Id.* at 12. In addition, Stamell submitted an affidavit to Judge Weinstein opposing Armstrong's motion to be personally relieved from the representation in which Stamell refers to the mortgage he had given to K & L, and that he proposed to increase that mortgage. (Defs.' Ex. 108 at ¶ 6.)

K & L not only met the ethical requirements for a Second Retainer to be enforceable under New York law, but also documented Stamell's willingness to use the Vineyard Property in his wife's defense.

(a) Coercion and/or Duress

■ Simply put, the real issue before this Court is whether Stamell was coerced into guarantying the payment of K & L's fees and expenses. During the course of the trial he repeatedly claimed that he had no alternative, that not only was it as if he had a gun put to his head but that his wife and sister-in-law, and her husband, Kresch, were equally coerced and subject to duress in the process of K & L's having all of them execute the Second Retainer. This Court does not agree that the facts presented here warrant such a conclusion in light of the standard the law has set to support such a finding.

■ The New York Court of Appeals explained the standard for duress in *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971). There the court stated, "The applicable law is clear .... A contract is voidable on the ground of duress when it is established that the party making the claim was forced to agree to it by means of a wrongful threat precluding the exercise of his free will." *Id.* at 131, 324 N.Y.S.2d 22, 272 N.E.2d 533. This Court finds that a review of the facts here does not support Stamell's claim that K & L exerted any wrongful threat that precluded the exercise of his free will.

Stamell alleges that duress makes the Second Retainer voidable because Armstrong and K & L conditioned continued representation of his wife on the signing of the Second Retainer even though K & L was obligated to provide representation under the First Retainer. Specifically, Stamell testified that K & L threatened to withdraw as counsel thereby forcing Stamell's wife to seek alternate counsel in a very short time prior to the First Trial, which would reflect poorly upon the Frank Sisters in the eyes of the presiding judge in their criminal case. (Stamell, Tr. 3/25/98 at p. 56–57.) The alternate counsel would be required to repeat a significant amount of work K & L had already done in order to adequately prepare for trial. (Stamell, Tr. 3/25/98 at p. 62.) In addition, Kresch testified that he too felt pressured to sign the Second Retainer by K & L. (Kresch, Tr. 6/10/98 at p. 5.) Kresch specifically testified to an exchange with Armstrong where Armstrong threatened that Jane, Kresch's wife, would go to jail if Kresch refused to sign his MOU. (Kresch, Tr. 6/10/98 at p. 20.) Armstrong claims to not remember having said this. (Armstrong, Tr. 7/31/98 at pp. 94–95.) Armstrong went so far as to tell Judge Korman at a hearing held before him that he, Armstrong, was "trying to figure out what conceivable pressure [K & L] could bring to bear" on the Frank Sisters, Kresch and Stamell. (Pl.'s Ex. 54 at p. 22.)

■ In *Regent Partners, Inc. v. Parr Dev. Co., Inc.*, 960 F.Supp. 607 (E.D.N.Y. 1997), the district court, after quoting the *Austin* case, explored the elements of duress and noted that where the party claiming duress had access to independent counsel at the time it entered the transaction in question, it becomes more difficult to "demonstrate the element of compulsion necessary to a finding of duress." *Id.* at 612 (quoting *First Nat. Bank of Cincinnati v. Pepper*, 454 F.2d 626, 634 (2d Cir. 1972)). In the instant case, the Second Retainer's relevant provision states:

> 15. *Independent Legal Advice.* The Firm recommended to the Clients and the Guarantors in November 1994 that each of them should be advised by independent counsel as to the effects of this Agreement and the obligations undertaken by each of them herein. The Firm was subsequently told that the parties would be so advised as follows: (i) Susan and Stamell, by Martin Gold, Esq., (ii) Jane and Kresch, by Robert E. Grossman, Esq., and (iii) Peter, by Abraham J. Backenroth, Esq. Such counsel have been kept informed throughout the process of formulating this Agreement, but the Firm takes no responsibility for the scope or content of their services to the Clients or Guarantors.

(Pl.'s Ex. 22 at ¶ 15.) There were arguments made to this Court by Stamell that this provision was not exactly accurate because the lawyers specified in the provision were not representing the clients as stated. (Stamell, Tr. 3/25/98 at pp. 95–97, 103–06.) However, if the provision is not accurate as to the lawyers specified, the clients clearly had time to retain counsel inasmuch as the Second Retainer was negotiated over a two month period. Furthermore, the above quoted provision had appeared in some form in earlier drafts so that the clients had been aware of it, and the clients in fact signed the agreement with this provision in place. (Pl.'s Exs. 6, 9, 11, 22.) Applying the *Regent* case's point from above, Stamell, as well as the others who signed the retainer agreement, clearly had an opportunity to retain independent counsel to assist them in deciding whether or not to sign the agreement. Because Stamell may not have chosen to retain independent counsel does not lessen the impact that duress was less likely to have occurred in this case due to the opportunity for him to have sought that counsel.

(b) Promissory Estoppel

K & L claims that even if the Second Retainer were found to be improperly ob-

tained, promissory estoppel prevents Stamell from claiming it cannot be enforced. This Court does not need to address that argument since it has been affirmatively decided that the Second Retainer was obtained properly, following the ethical standards and without duress.

3. Stamell's Memorandum Of Understanding

Stamell's MOU was executed on or about March of 1996, several months after he had filed the within Chapter 11 case on January 24, 1996. The MOU contained the statement "Jared's obligations hereunder and the new mortgage are subject to the approval of the Bankruptcy Court [having jurisdiction over Jared's bankruptcy proceeding]." (Pl.'s Ex. 22 at p. 4.) As was mentioned earlier in this opinion, a hearing was held by this Court on June 27, 1996 on K & L's motion to approve the MOU as well as Stamell's written opposition papers. At the hearing, the undersigned made the following ruling: "I have the exclusive jurisdiction over the property of the debtor. I am the one that would provide for a mortgage to be given to anybody if I see fit. I have announced and indicated that I see no legal basis for providing anybody with a mortgage for services previously rendered and that is my decision." (K & L's Mot. To Approve Stamell's MOU, Tr. 6/27/96 at p. 36.) Thus the motion was denied because there is no authority in the Bankruptcy Code for a bankruptcy court to approve a mortgage to secure services that had already been rendered whereas the Court could have granted the motion in consideration of future services to be rendered, as contemplated by section 364 of the Bankruptcy Code.[5]

K & L also moved to have the value of its post-petition services deemed an administrative expense. That motion was also denied by this Court on the grounds that such services did not constitute actual, necessary costs and expenses of preserving Stamell's estate as required by section 503(b)(1) of the Bankruptcy Code, which sets forth the instances where administrative expenses may be allowed. K & L's services also were not beneficial to Stamell's estate which is a condition to such services being allowed as a priority administrative expense. *See In re Klein Sleep Products, Inc. (Nostas Assoc. v. Costich)*, 78 F.3d 18, 22–23 (2d Cir.1996). While K & L's efforts to defend Stamell's wife may have been beneficial to his personal relationship with her, they were of no benefit to his estate. Thus K & L's contention that Susan had no money to pay them, whereas her husband did, does not alter this Court's decision. Susan is not the debtor here. Her husband is.

Both the orders denying the motion for the mortgage and payment of K & L's administrative expense have been appealed and are currently pending before Judge Weinstein in the District Court.

By virtue of the fact that the MOU required the approval of the bankruptcy court in order to be effective, and this Court denied such approval, there is no need to inquire as to whether K & L properly had Stamell execute the MOU in compliance with the ethical standards discussed earlier regarding the Second Retainer. K & L complains that although Stamell had agreed to join it in its motion to approve the MOU and mortgage, instead Stamell filed papers in opposition to the motion. However, irrespective of the position that Stamell took on the motion, as has been previously stated it was this Court's recognition of the provisions of the bankruptcy law and its concern for the rest of the creditor body and the MOU's effect on them, which resulted in the denial of the motion, not Stamell's opposition to it. Finally, this Court denies K & L's request as contained in its post-trial brief

5. Section 364 of the Bankruptcy Code, in pertinent part, provides that the court may authorize the trustee (or debtor-in-possession) to obtain credit or to incur debt secured by a lien on property of the estate. 11 U.S.C. § 364.

that this Court approve the MOU and accompanying mortgage not only for the reasons heretofore discussed but further because this Court has been divested of jurisdiction to pass upon the request by virtue of the appeal filed from this Court's order. That decision is now firmly in the capable hands of the District Court.

4. The Doctrine of *Strictissimi Juris*

Stamell raises the argument that Kresch's MOU modified the Second Retainer and by doing so discharged his guaranty under the Second Retainer. The parties concede that Kresch's MOU "modified certain terms of the Second Retainer." (Pl.'s Pre–Trial Order, Undisputed Fact 17.) Stamell claims that under the doctrine of *strictissimi juris,* he is discharged from his guaranty by operation of law.

New York Jurisprudence, 2nd § 116, gives the following definition of *strictissimi juris:*

> The rule of strictissimi juris is applicable to contracts of guaranty, and a guarantor should not be bound beyond the express terms of his agreement. The liability of a guarantor or the obligation of a surety is strictly construed. They are held only to the express terms of their respective agreements, and their liability is strictly limited by the terms, scope, and meaning of the agreement executed. The well-established rule that an uncompensated surety's obligation is construed strictissimi juris in the surety's favor, so that he is not liable beyond the express terms of his contract, means that his liability may not be altered or extended beyond the express contractual obligation without his consent, and his responsibility is not to be extended or enlarged by implication or construction.

63 N.Y.JUR.2d, Guaranty and Suretyship § 116 (citations omitted).

*Strictissimi juris* is applied by courts where the guarantor of a debt has not consented to a change in the terms of the original agreement. *See Depositors Trust Co. v. Hudson General Corp.,* 485 F.Supp. 1355, 1362 (E.D.N.Y.1980); *Congregation Ohavei Shalom, Inc. v. Comyns Brothers, Inc.,* 123 A.D.2d 656, 507 N.Y.S.2d 28 (1986) (Court found that guarantor was released from her guaranty because she did not consent to Extension Agreement which increased the time for payment as well as the interest rate of the loan); *Mangold v. Keip,* 177 Misc.2d 953, 954, 679 N.Y.S.2d 240 (N.Y.App.Term 1998) (Guarantor released where term added to lease renewal providing that landlord could terminate lease without qualification in the event a use violation was placed on the premises and guarantor never consented to this new term). In *Depositors,* the District Court explained that under New York law, " if [the lender] modified or changed in any manner its agreement with [the borrower], [the guarantor] was discharged regardless of the extent of injury it sustained." *Depositors,* 485 F.Supp. at 1362. In that case, the court found that an agreement altered the original lending agreement whereby there was to be "subsequent use of the [guarantor's] collateral to secure the supplemental loan." *Id.* at 1364. Such modification increased the guarantor's risk without his consent in that case, which is what the doctrine of *strictissimi juris* seeks to avoid.

The determining factor as to the application of *strictissimi juris* to this case is whether or not Stamell consented to Kresch's MOU. The Debtor contends that Undisputed Fact 20, from the Plaintiff's Pre–Trial Order, which reads, "Jared's March 1996 memorandum of understanding expressly states that: 'Jared's obligations hereunder and the new mortgage are subject to the approval of the Bankruptcy Court [having jurisdiction over Jared's bankruptcy proceeding]'," means that Stamell never consented to Kresch's MOU. (Pl.'s Pre–Trial Order, Undisputed Fact 20 (quoting Pl.'s Ex. 63 at ¶ 8.)) The court assumes that the Debtor means that he was not capable of consenting without

the Bankruptcy Court's approval. Yet, Stamell clearly signed his MOU which incorporated Kresch's MOU into it. Stamell had notice of Kresch's MOU and in fact everything contained in Kresch's MOU is identical to Stamell's MOU except for paragraph 5 of Kresch's MOU which states:

> 5. Richard [Kresch] agrees to be directly and personally liable for $250,000 of our second trial charges (in addition to the $250,000 personally committed by Jared), payable not later than June 15, 1996 even if the total amount of the charges has not yet been resolved. We shall be entitled to interest in accordance with law on any part of such amounts not paid by June 15, 1996.

(Pl.'s Ex. 64 at ¶ 5.) In fact, even the content of paragraph 5 is referenced in paragraph 5 of Stamell's MOU where, while outlining the $250,000 Stamell agrees to be personally liable for, it states "(in addition to the $250,000 personally committed by Richard)." (Pl.'s Ex. 63 at ¶ 5.)

Two cases cited by the Plaintiff in support of the use of the *strictissimi juris* doctrine in the instant case are *Bier Pension Plan Trust v. Estate of Joel Schneierson,* 74 N.Y.2d 312, 546 N.Y.S.2d 824, 545 N.E.2d 1212 (1989) and *Becker v. Faber,* 280 N.Y. 146, 19 N.E.2d 997 (1939). In *Bier,* the court held that, "[i]f the creditor retains the right to demand payment of the debt according to its original terms the surety is not discharged." *Bier,* 74 N.Y.2d at 316, 546 N.Y.S.2d 824, 545 N.E.2d 1212. In *Becker,* the court found that if parties agree to different timetables for payment, and it becomes a new binding contract, that alters the terms of the original contract which the guarantor did not consent to, the guarantor is released. *Becker,* 280 N.Y. at 151, 19 N.E.2d at 999–1000. These cases are inapposite because in the instant case, this court finds that Stamell did consent to Kresch's MOU, as explained earlier.

5. Release of Kresch's Guaranty and Collateral

Another issue raised is whether the release of Kresch's guaranty and his collateral discharged Stamell's guaranty. The Court is of the opinion it did not.

As has been previously noted, by letter agreement dated August 27, 1996 and signed by Kresch and K & L, K & L released its security interest in Kresch's interest in the Montgomery Nursing Home and released Kresch from his obligations under the Second Retainer in exchange for a payment of $250,000. This agreement was entered into in order for Kresch to be able to sell his interest in the Nursing Home. In or about August 1996, his interest was sold for approximately $1,600,000. At the time of the sale, K & L had a security interest in Kresch's interest in the Nursing Home in the amount of approximately $1,800,000. Stamell contends that this agreement modified and essentially released Jane under the Second Retainer by limiting the property in Jane's name alone against which K & L could seek to collect its fees and expenses. This, Stamell argues, meant that K & L agreed not to force Jane to pay its fees and expenses by executing on her interest in the cooperative apartment that she then owned jointly with her husband, Kresch. Stamell contends that by releasing Kresch, his coguarantor, and altering the obligations of one of the primary obligors without Stamell's consent, K & L extinguished Stamell's guaranty.

Stamell supports his argument with a number of cases. In *Rutherford Nat. Bank v. Manniello,* 240 A.D. 506, 271 N.Y.S. 69 (1934) aff'd 266 N.Y. 568, 195 N.E. 203 (1935) a borrower was indebted to the plaintiff as represented by a original note that had $5,955.37 still owed on it, payment of which was guarantied by the defendant. *Rutherford,* 240 A.D. at 506, 271 N.Y.S. at 69. A new note was issued to cover that amount plus a new $1,900 loan. The original note was marked "cancelled" and "paid." *Rutherford,* 240 A.D.

at 507, 271 N.Y.S. at 71. The court found that since the guarantor had never consented to the new note, which clearly changed the terms of the original agreement, the guarantor was released. *Rutherford,* 240 A.D. at 508, 271 N.Y.S. at 71. *New York City School Construction Authority v. Koren–DiResta Construction Co. Inc.,* 249 A.D.2d 205, 671 N.Y.S.2d 738 (1998), also cited by Stamell, held that the two sureties were discharged because the termination agreement altered the original agreement without the sureties' consent. Lastly, in *Jones v. Gelles,* 167 A.D.2d 636, 562 N.Y.S.2d 992 (1990), the court stated that "as a matter of law a release discharges the surety because it impairs the surety's right of subrogation against the principal." *Id.* at 637, 562 N.Y.S.2d 992 (citations omitted).

In defense, K & L argues that under New York General Obligations Law § 15–104, as long as the document releasing the co-guarantor explicitly reserves the right to proceed against other parties, the release does not operate to discharge the liabilities of those other parties. That section addressing the discharge of one obligor, with reservations, states:

> the obligee's release or discharge of one or more of several obligors, or of one or more of joint, or of joint and several obligors shall not discharge co-obligors, against whom the obligee in writing and as part of the same transaction as the release or discharge, expressly reserves his rights....

NY GEN. OBLIG. LAW § 15–104. The release agreement between Kresch and K & L provides as follows:

> 4. *Effect on other parties.* Nothing contained herein shall prejudice or affect the rights of K & L, or any party (except Kresch), with respect to other parties obligated under the Retainer Agreement, the MOU or the Memorandum of Understanding with Jared Stamell, dated March 7, 1996, or any security or collateral granted thereunder or therefor.

(Pl.'s Ex. 79 at ¶ 4.)

K & L clearly reserved its rights in paragraph 4 of the release agreement, quoted above, to pursue Stamell as a guarantor pursuant to New York General Obligations Law § 15–104. *See North Fork Bank & Trust Co. v. Thomason Industries Corp.,* 194 A.D.2d 772, 774, 599 N.Y.S.2d 835, 836 (1993) ("In its written release of the co-guarantors, the plaintiff bank reserved its rights against the defendant guarantors. Thus, the release did not discharge the defendant guarantors' liability or reduce their obligations."); *Citibank, N.A. v. Hoffman,* 244 A.D.2d 151, 663 N.Y.S.2d 571 (1997) (First Department held that where release of one guarantor expressly reserved lender's rights as against co-guarantor, the liability of the co-guarantor was not discharged.)

Most importantly it appears that it was Stamell's own law firm, Stamell & Schager, LLP, by its other named partner, Richard Schager, that represented Kresch in negotiating the release with K & L. The law firm informed K & L that Kresch's willingness to go forward with the sale was contingent on his being able to pay approximately $160,000 to other attorneys handling his wife's appeal. (Defs.' Ex. 137 at ¶ 3.) After deducting the transaction costs and Kresch's tax liability, Stamell's firm advised K & L that there would only be $250,000 available to it out of the sale proceeds. *Id.* As a matter of equity, it seems disingenuous of Stamell to claim Kresch's release had the effect of nullifying Stamell's guaranty when it was Stamell's own firm that represented Kresch in negotiating the release. This court finds that the release had no effect on the validity of Stamell's guaranty.

6. Limit on Guaranty

Stamell argues that the terms of the Second Retainer limit his guaranty to $500,000 until such time as any liens and other defects are removed from the Vine-

yard Property. This Court does not adopt that argument inasmuch as it was within Stamell's control, not K & L's, to correct those defects. In addition, the provision providing for Stamell to have a personal guaranty of $500,000 was only to be substituted in the event the mortgage on the Vineyard Property was not enforceable.

CONCLUSION

1. This Court has jurisdiction over the instant matter pursuant to 28 U.S.C.A. §§ 157 & 1334 and the Standing Order of Referral of Cases to Bankruptcy Judges for the Eastern District of New York, dated August 28, 1986. Debtor's motion is a core matter within 28 U.S.C.A. § 157(b)(2)(A), (B), (C), (H), (K) and (O).

2. Pursuant to Federal Rule of Bankruptcy Procedure 7052, this opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

3. K & L is deemed to have a secured claim in an unliquidated amount, is secured by the mortgage on the Vineyard Property given to a trust created by K & L under the Second Retainer.

4. The Second Retainer is enforceable by K & L as against Stamell for the reasons stated in this opinion. To the extent that it provided for the payment of K & L's fees and expenses by Stamell as guarantor, the amount of the same is to be determined by this Court at a later hearing as directed below.

5. K & L is directed to contact chambers to obtain a hearing date to determine the amount and extent of Stamell's obligations to K & L under the Second Retainer and to consider the motion for fees which was referred to this Court by Judge Weinstein. Upon receiving a hearing date, K & L is directed to give notice of the hearing to the parties involved in this adversary proceeding as well as all parties that received notice of the Fee Motion when it was before Judge Weinstein.

6. K & L is directed to settle an order in conformity with the above opinion.